## GUERRA *v*. EL TESORERO DE PUERTO RICO.

### APELACIÓN procedente de la Corte de Distrito de

### San Juan.

No. 45.    Resuelto en Abril 7, 1905.

CONTRIBUCIONES.—JUNTA DE REVISIÓN É IGUALAMIENTO.—La Ley de Rentas Internas autoriza el recurso de alzada contra la resolución de un tasador, en materia de contribuciones, para ante la Junta de Revisión é Igualamiento, que tiene facultades para resolver todas las reclamaciones hechas por los contribuyentes con relación á la tasación de sus propiedades, y para aumentar ó disminuir la tasación que contenga alguna planilla, haya ó no protesta alguna formulada contra la misma.

ID.—RESOLUCIÓN DE LA JUNTA.—La resolución de la Junta en todas aquellas cuestiones que sean debidamente sometidas á su consideración, será firme, sin que contra ella proceda apelación alguna para ante el Consejo Ejecutivo.

ID.—FACULTADES GENERALES DE LA JUNTA.—La intención de la Legislatura al crear la Junta de Revisión é Igualamiento, fué la de concederle una inspección general sobre la imposición de contribuciones, no siendo necesario ningún precepto que expresamente niegue el derecho al contribuyente de formular su protesta ante los Tribunales de Justicia, ya que la cláusula general derogatoria es suficiente á ese efecto.

ID.—NUEVO SISTEMA DE CONTRIBUCIONES.—LEY DE COLONIAS AGRÍCOLAS.—Al aprobar la Legislatura la Ley de Rentas Internas estableció un nuevo sistema de contribuciones, revocando todos los anteriores, haciendo aquellas exenciones que estimó procedentes, y revocando y anulando las que no fueron consignadas expresamente, y anulando, asimismo, los beneficios concedidos por la Ley de Colonias Agrícolas en materia de contribuciones.

ID.—VÍA CONTENCIOSO-ADMINISTRATIVA.—Para recurrir al procedimiento contencioso-administrativo, la parte deberá agotar previamente los recursos gubernativos, y reclamado un privilegio en materia de contribuciones, y negado el derecho por el Tesorero, su resolución debe ser recurrida para ante la Junta de Revisión, antes de establecerse el procedimiento contencioso-administrativo.

ID.—JURISDICCIÓN SOBRE LA PERSONA Y SOBRE LA MATERIA.—La jurisdicción sobre la *persona* se presume, cuando de los autos no consta nada en contrario, mas nunca se presume la jurisdicción sobre la *materia*, y cuando falte, el consentimiento de las partes no puede conferirla.

ID.—EXCEPCIONES DILATORIAS.—El procedimiento contencioso-administrativo autoriza la presentación de excepciones dilatorias, y entre ellas se encuentra la que se refiere á la jurisdicción del Tribunal, pudiendo presentarse dichas excepciones antes de la contestación, ó junto con la misma, pero el Tribunal está obligado á resolverlas previamente.

ID.—JURISDICCIÓN DEL TRIBUNAL EN PLEITOS CONTENCIOSO-ADMINISTRATIVOS.—El agotamiento de los recursos gubernativos es un requisito indispensable para dar jurisdicción al Tribunal en los casos contencioso-administrativos.

ID.—PAGO VOLUNTARIO DE CONTRIBUCIONES.—El pago de contribuciones hecho por un contribuyente que no esté bajo coacción con respecto á su persona ó á sus bienes, debe considerarse voluntario.

ID.—COBRO DE CONTRIBUCIONES ILEGALES.—Para que el contribuyente pueda salvar sus derechos á recobrar las cantidades satisfechas por contribuciones ilegalmente impuestas sobre sus bienes, debe esperar, para verificar el pago, hasta el momento en que se vea amenazado con una venta de sus bienes, y entonces hacer el pago con protesta, ó ejercitar los recursos adecuados para evitar que tal venta se lleve á efecto.

ID.—RECUPERACIÓN DE CANTIDADES PAGADAS POR CONTRIBUCIONES ILEGALES.—Las cantidades que voluntaria é inadvertidamente, y sin protesta alguna, se hubieren pagado al Tesorero, por concepto de contribuciones, y bajo una equivocada reclamación de derecho, no pueden ser recuperadas por la vía judicial, sino por la acción de la Legislatura.

ID.—TRATADO DE PARÍS.—BIENES PERTENECIENTES Á PARTICULARES.—El art. XIII del Tratado de París se refiere solamente á los bienes inmuebles pertenecientes á la Corona de España, la cesión de los cuales, al Gobierno Americano no puede afectar los derechos de los individuos particulares, pero tal artículo no tiene aplicación á los bienes de propiedad privada, ni á los beneficios otorgados por la Ley de Colonias Agrícolas, en materia de contribuciones.

ID.—CASOS EN QUE LA REDUCCIÓN Ó EXENCIÓN DE CONTRIBUCIONES CONSTITUYE UN CONTRATO.—Para que la reducción ó exención de contribuciones otorgada por el Estado, tenga el carácter de contrato y no pueda ser afectada por legislación posterior, es necesario que exista una *causa*, como en cualquier otro contrato, es decir, que el contribuyente venga obligado á hacer algo, ó haya hecho algo, en beneficio del Estado, pues de lo contrario la concesión queda reducida á un *nudum pactum*.

ID.—CAUSA.—Se entiende por causa, á los efectos de determinar la existencia de un contrato, el beneficio ó beneficios que una parte derive de la otra, ó ésta se obligue á conferirle, y á los que no tuviere derecho anteriormente; ó también, los perjuicios que una parte sufriere por virtud de la otra, y que no viniera obligada á sufrir, siendo la existencia de tales beneficios ó perjuicios, la razón que indujera á la otra parte á obligarse.

ID.—BENEFICIOS CONCEDIDOS POR LA LEY DE COLONIAS AGRÍCOLAS.—Examinada á la luz de los principios anteriormente expuestos, la reducción ó exención de contribuciones, concedida por el Gobierno Español, de acuerdo con la Ley de Colonias Agrícolas, no constituye un contrato, por carecer de causa, que es elemento esencial, y en su virtud puede ser modificada ó derogada por la Legislatura, como ha sido, en efecto, derogada dicha Ley de Colonias Agrícolas por la Ley de Rentas de 1901.

Abogado del apelante: *Sr. del Toro,* Fiscal.

Abogado de los apelados: *Sr. Sarmiento.*

EL JUEZ ASOCIADO SR. MACLEARY, emitió la opinión del Tribunal.

En el presente caso, se trata de un recurso de apelación interpuesto por el Hon. Fiscal General de Puerto Rico contra sentencia dictada por el Tribunal de Distrito de

San Juan, el 17 de Junio de 1904, en una demanda *conten-cioso-administrativa* entablada por Don Mauricio Gue-rra y Don Arturo Guerra, contra una resolución del Te-sorero de Puerto Rico, referente al efecto de concesiones que alegan habérseles hecho con respecto á la hacienda denominada "Blandito", de acuerdo con la Ley de Colo-nias Agrícolas.

Bajo el gobierno español, los Señores Guerra gozaron de una rebaja en las contribuciones impuestas sobre su hacienda conocida por "Blandito", en virtud de una ley establecida en España en 3 de Junio de 1868, y que des-pués se hizo extensiva á varias de las Colonias, y entre otras, á Puerto Rico. Al ocurrir la ocupación americana, dicha ley fué dejada en vigor hasta la adopción de la Ley de Rentas Internas del 31 de Enero de 1901, conocida co-munmente por la "Ley Hollander" que derogó ó trató de derogar todas las demás leyes referentes á contribuciones impuestas sobre bienes raíces, y otras contribuciones en Puerto Rico, y creó un sistema de contribuciones entera-mente nuevo, ideado al estilo americano. Bajo la Ley Hollander, se hizo el reparto de la hacienda "Blandito" en la misma forma que el de otros terrenos en Puerto Ri-co, pero antes de que dicha ley empezase á regir, en 1o. de Julio de 1901, Don Mauricio y Don Arturo Guerra pre-sentaron al Tesoro una petición, solicitando que se les permitiese continuar pagando su contribución por dicha hacienda de caña lo mismo que antes, ó sea á razón de treinta y un pesos anuales, ó diez y ocho dollars y sesen-ta centavos, en moneda americana.

El Tesorero de Puerto Rico, Hon. W. F. Willoughby, oyó la opinión del Fiscal General con respecto á este asun-to, y fué informado de que la hacienda "Blandito" esta-ba sujeta á la imposición de contribuciones lo mismo que otros terrenos; y que la Ley Hollander había derogado los beneficios de la Ley referentes á Colonias Agrícolas, en virtud de la cual se reclamaba la rebaja. La resolución

del Tesorero puede expresarse sustancialmente en el texto del dictámen emitido por la Oficina del Fiscal General en 11 de Diciembre de 1901, cuyo dictámen es como sigue:

"Soy de parecer que estos propietarios, que pretenden que sus terrenos están exentos de pagar contribución, en virtud de una ley española, han sido culpables de tal negligencia que les priva de que la administración reconozca esa exención. Con arreglo á la ley de Rentas, podían acudir á la Junta de Revisión, y de ésta al Consejo Ejecutivo, y de esta manera hubiesen podido obtener una resolución autorizada acerca de si era ó no procedente el reparto. Si se arguye que tal procedimiento es para la revisión del reparto *in toto,* hay motivo suficiente para decir que esto confirma la aserción de que fué intención de la ley de rentas, establecer un sistema tributario uniforme, someter todas las propiedades á la contribución y no reconocer exención alguna. Bajo el punto de vista administrativo, la ley de Rentas debe ser así interpretada, especialmente en vista del texto de los artículos 1 y 2 y de dicha ley. El artículo 1 establece el impuesto de 1|2 del 1% sobre toda propiedad mueble ó inmueble. El artículo 2 dice que toda propiedad no expresamente exentada, debe estar sujeta á tributación según se previene por la presente. El artículo 3 contiene las exenciones expresas á que se ha hecho referencia anteriormente. La subdivisión B. del artículo 3 especifica las propiedades exentas de pagar contribución, según las leyes de los Estados Unidos. El caso de los señores Guerra no está comprendido en ninguna otra exención especificada en el artículo 3.

La exención que se reclama en virtud de los artículos 7 y 8 de la Ley de Colonias Agrícolas, no era en la forma de un contrato hecho por el Estado con sus ciudadanos, sino era en la naturaleza de un privilegio especial ó indulgencia. La soberanía que dió, pudo quitar, derogando la ley, ó suspendiendo la continuación del favor especial concedido. Esa prerrogativa de soberanía pasó á la Legislatura de Puerto Rico. El Tratado de París, en su artículo 8, dice "que la cesión no podrá de ninguna manera perjudicar la propiedad ó los derechos que por la ley le corresponden á la pacífica posesión de propiedades de todas clases de una provincia, etc., ó de un individuo particular." Pero esto se refiere á la cesión por España á los Estados Unidos, de propiedades del dominio público y de la Corona: no reconoce una mera concesión de exención del pago de contribuciones por un número de años, como una propiedad ó como un derecho de propiedad. La exención concedida por los artícu-

los 7 y 8 de la Ley de Colonias Agrícolas, está en contradicción con la intención de la Legislatura de Puerto Rico de imponer contribución á toda propiedad no exentada expresamente en el artículo 3 de la Ley; y esos artículos, por lo tanto, están sujetos á las disposiciones del artículo 111, que derogan todas las leyes, decretos y ordenanzas que estén en contradicción con la Ley de rentas.

Los funcionarios encargados de administrar la ley de Rentas, deben aplicarla con respecto á las propiedades, imponiendo la contribución á debido tiempo, la cual constituirá un derecho de retención sobre la propiedad si no se paga. Los Señores Guerra podrán entonces hacer valer su exención por la vía judicial que tienen expedita.''

Con arreglo á las leyes de Puerto Rico vigentes en esa época, los citados contribuyentes, en vez de seguir el curso indicado en el último párrafo del dictámen emitido por la Oficina del Fiscal General, se valieron del procedimiento conocido por ''Contencioso-administrativo'', y transfirieron la cuestión bajo dicho procedimiento á la Corte de Distrito de San Juan, que en 16 de Enero de 1904, dictó sentencia á su favor. En la petición presentada por los demandantes al seguir su causa ante dicho Tribunal de Distrito, se consigna su reclamación sustancialmente como sigue:

''Don Mauricio Guerra y Don Arturo Guerra, dueños de la citada finca, acudieron al Hon. Tesorero de esta Isla, en ocho de Mayo de mil novecientos uno, manifestándole que desde el 18 de Agosto de mil ochocientos noventa y seis, se habían concedido á dicha finca los beneficios de los artículos 7 y 8 de la Ley de Colonias Agrícolas, ó sea que durante diez años contados desde aquella fecha, sólo pagarían en concepto de contribución territorial, la suma que hasta entonces habían satisfecho, ó sean treinta y un pesos provinciales anuales, equivalentes á diez y ocho dollars sesenta centavos, según lo hizo saber la Administración Central de Contribuciones y Rentas á la Alcaldía de Vega-baja, en oficio de once de Marzo de mil ochocientos noventa y ocho. Que á pesar del cambio de soberanía ocurrido en la Isla, no se había alterado esa contribución, por haberse respetado su privilegio en armonía con el artículo 8o. del Tratado de París.

Y que esto no obstante, el Tasador del Distrito de Vega-baja había valorado la finca de los exponentes para imponerle contribución con arreglo al llamado Bill Hollander, por lo que acudían al Hon. Tesorero, para que se dispusiera que se respetara su concesión como se había hecho hasta entonces, á pesar de que durante el Gobierno Militar del General Henry, varió el sistema de tributación, estableciendo entonces el de la Cartilla Guía del Dr. Coll y Toste. En dicho escrito y otro que presentaron en veinte de Agosto del propio año de mil novecientos uno, maifestaron también los peticionarios que cuando adquirieron la finca en mil ochocientos noventa y cinco, estaba completamente abandonada y sin cultivo desde hacía más de quince años, mientras que en la fecha de sus solicitudes, aparecían sembradas en ella doscientas cincuenta cuerdas de caña, que pronto se elevarían á trescientas, para lo cual habían tenido que hacer gastos cuantiosos en desaguar poyales ó pantanos, tumbar montes y malezas, y otros trabajos extraordinarios, que solo al amparo de los beneficios que les dispensaba la Ley de Colonias Agrícolas, se habían decidido á emprender. Que esa Ley se había dictado no para proveer de Rentas al Tesoro de Puerto Rico, sino para estimular el fomento agrícola de sus terrenos que habrían permanecido improductivos á no ser por aquella sabia y generosa léy; que al conceder á los dueños de esas tierras, el privilegio de pagar una exigua contribución durante cierto número de años, beneficiaba también al Tesoro público, pues una vez corrido el plazo, se encontraba con predios ricos y fecundos, que contribuirían con largueza al sostenimiento de las cargas públicas. Y por último que la sección 111 de la Ley para proveer de Rentas al Pueblo de Puerto Rico, al derogar como derogaba todas las demás que estuviesen en oposición con ella, sólo se refería á las que establecían otros sistemas de tributación anteriores á la promulgación del Bill Hallander, con el mismo fin que éste; pero no á la ley de Colonias Agrícolas, que no habiéndose promulgado con ese objeto, sino con el de estimular el fomento y desarrollo de la Agricultura de la Isla, no ha sido derogada, y continúa vigente.

En nueve de Diciembre del repetido año de mil novecientos uno, acudieron de nuevo los Señores Guerra al Hon. Tesorero, suplicando les comunicase la resolución, dada á sus anteriores escritos, y entonces recayó la de once del repetido mes de Diciembre de mil novecientos uno, en que, de acuerdo con lo consultado por el Acting Attorney General, desestimó la pretensión de los Señores Guerra por los siguientes fundamentos: 1o. Por haber sido negligentes en no acudir oportunamente á la Junta de Revisión y al Consejo Ejecutivo,

como pudieron haberlo hecho con arreglo á la ley de Rentas, en cuyo caso se hubiera resuelto si procedía valorar ó no su finca. 2o. Porque el espíritu de dicha ley de Rentas había sido y era el de establecer un sistema tributario uniforme en que toda propiedad fuese tasada sin reconocer excepción alguna. 3. Porque según las Secciones una y dos de dicha ley, toda propiedad no exenta expresamente, está sujeta á tributación, y entre las excepciones expresas que determina su sección tercera, ninguna comprende el caso de los Señores Guerra. 4o. Porque la soberanía que dió el privilegio, pudo quitarlo, suspendiendo la continuación del favor especial concedido, y porque esa prerrogativa de la soberanía pasó á la Legislatura de Puerto Rico con motivo del cambio de dominación ocurrido en esta Isla. 5o. Porque si bien el artículo 8o. del Tratado de París respetó la propiedad y los derechos de todas clases á ella relativos, correspondientes á una Provincia ó individuo particular, ese sólo se contrae á las propiedades de dominio público ó de la Corona, sin que pueda aplicarse á una exención del pago de contribuciones durante cierto tiempo. Y 6o. Porque la exención concedida por las Secciones 7 y 8 de la Ley de Colonias Agrícolas, está en contradicción con el espíritu de la Ley de Rentas de imponer contribución á toda propiedad no exenta expresamente por ella, siendo evidente, por tanto, que está comprenda dentro de su sección 111, que deroga todas las leyes y disposiciones que se opongan á la ley de Rentas.

La referida resolución gubernativa termina manifestando que los Señores Guerra podían recabar su exención por la vía judicial que tenían expedita; y en su consecuencia, en veinte y uno de Febrero del año próximo pasado, acudieron los Señores Guerra á este Tribunal, acompañando copia de la comunicación del Gobierno General de la Isla, de diez y ocho de Agosto de mil ochocientos noventa y seis, comprensiva de la concesión del beneficio de la Ley de Colonias Agrícolas y la original del Señor Tesorero, denegando su pretensión, así como su traducción, interponiendo el oportuno recurso contencioso-administrativo contra esa resolución que vulneraba un derecho preexistente, y suplicando que habiéndolo por interpuesto se reclamase de la Administración el expedido gubernativo.

En provisto del veinte y uno de Febrero, se accedió á esa solicitud, mandando reclamar el expediente administrativo, y con escrito de cinco de Abril, presentaron los Señores Guerra dos recibos, fecha diez de Marzo del propio año, de haber pagado por el segundo semestre del año económico de mil novecientos uno á mil novecientos

dos, la contribución territorial de cincuenta dollars, setenta y nueve centavos, é igual suma por la contribución municipal, cuyos recibos se mandaron agregar á los autos en la propia fecha. En diez y nueve de Junio, recibido el expediente administrativo reclamado, se mandó dar visita de él y de los demás antecedentes á los recurrentes, para que formulasen su demanda dentro de veinte días, cuyo plazo se les prorrogó á diez días más, y dentro de ellos la presentó su representante, Licenciado Don Hilario Cuevillas, fundándola en ciertos hechos consignados detalladamente."

En el Tribunal de Distrito, el Fiscal presentó primeramente una excepción previa contra la demanda, que fué considerada y desechada por el Tribunal. Entonces se contestó la demanda, haciéndose la defensa de acuerdo con las indicaciones hechas en el dictámen del Fiscal General Interino. Se practicó la prueba de la que puede decirse que probó los hechos esenciales alegados por los referidos contribuyentes, sin justificar las conclusiones legales sostenidas por los mismos como dimanadas de dichos hechos. Algunos de los puntos establecidos por el representante del Gobierno, no fueron tomados en consideración por el Tribunal sentenciador, habiéndoselas desestimado probablemente en la providencia desechando la excepción previa, y no aparecen haber sido resueltas en la sentencia dictada.

Para poder comprender mejor el presente caso, se transcribirá la sentencia literalmente. Dicha sentencia es como sigue:

"En la Ciudad de San Juan de Puerto Rico, á diez y seis de Enero de mil novecientos cuatro; visto este recurso contencioso administrativo promovido por Don Arturo y Don Mauricio Guerra, defendidos por el Abogado Don Hilario Cuevillas, y en el acto del juicio, por Don Antonio Sarmiento, contra una resolución del Tesorero de Puerto Rico, de once de Diciembre de mil novecientos uno, desestimando la pretensión de aquéllos, de que continuara aplicándose á la finca propiedad de los mismos denominada "Blandito", los beneficios concedídoles al amparo de la Ley de Colonias Agrícolas,

por el Gobierno General de la Isla durante la soberanía de España.—1er. *Resultando*: que el Abogado Don Hilario Cuevillas, á nombre de Don Mauricio y Don Arturo Guerra, interpuso en tiempo y forma el recurso contencioso-administrativo contra una resolución de la Administración, por haber desconocido ésta á sus representados los beneficios de la Ley de Colonias Agrícolas á que se había acogido para el cultivo, explotación y saneamiento de una finca, propiedad de aquellos, denominada "Blandito", situada en la jurisdicción de Vega-baja, compuesta de trescientas sesenta y siete hectáreas, tres áreas de extensión, de las que ochenta y siete hectáreas, cincuenta áreas y cinco centiáreas eran poyales excesivamente húmedos, ciénegas y lugares pantanosos; y las restantes doscientas sesenta y ocho hectáreas, noventa y cuatro áreas y cinco centiáreas eran terreno inculto hacía más de quince años.—2o. *Resultando*: que reclamado el expediente administrativo de la autoridad correspondiente, y recibido éste se dió vista con los demás antecedentes á los recurrentes, para que en el término de treinta días, prorrogable por diez más, formulasen la correspondiente demanda contenciosa-administrativa, al expirar el cuál, lo hizo á nombre de los recurrentes el mencionado Letrado Sr. Cuevillas, bajo los siguientes hechos: que sus representados eran dueño de la finca "Blandito", de trescientas setenta y siete hectáreas y tres áreas, sita en la jurisdicción de Vega-Baja: que de esa extensión, ochenta y siete hectáreas, cincuenta áreas y cinco centiáreas, eran poyales, ciénegas y pantanos, y el resto de la finca, terreno inculto hacía más de quince años; que sus representados se acogieron á la Ley de Colonias Agrícolas, vigente en Puerto Rico en 1883, pues de otra manera no era posible cultivar y hacer fructífera tal propiedad, y corridos los trámites correspondientes, se dictó el decreto contenido en el oficio acompañado á su demanda, concediendo á sus patrocinados el derecho de la Ley de Colonias Agrícolas á que antes se ha hecho referencia; que con tal motivo ha venido cultivándose la finca de los Señores Guerra bajo lo ordenado por el decreto referido: que para hacer respetar éstos sus derechos acudieron á la Tesorería General, la que después de varios trámites dictó la resolución recurrida, que fué comunicada á los interesados en once de Diciembre de mil novecientos uno; que contra esa resolución que causa estado y vulnera un derecho preexistente, se interpuso recurso contencioso-administrativo contra la Administración, que fué admitido por auto de veinte y uno de Febrero de mil novecientos dos: que con escrito de cinco de Abril del propio año, acompañaron los recibos del pago de las contribuciones, sin perjuicio

de recurrir contra semejante cobro; que después del cambio de so-
beranía se respetó el derecho concedido á los dueños de la finca "Blan-
dito", según consta de un documento y varios recibos de contribucio-
nes que acompañaban; que al formalizarse la planilla para el pago
de la contribución Hollander en la columna correspondiente á las
observaciones, se hizo constar el beneficio de que disfrutaba dicha
finca, como acogida á la ley de colonias agricolas, concedido por el
Gobierno Español, á pesar de lo que el Tasador se limitó sencilla
y llanamente á tasar la finca, alegando que no era de su compe-
tencia resolver asuntos de esta índole, por cuya causa se acudió al
Tesorero el que á su vez pasó el asunto al Attorney General, quien
desestimó la petición; que la finca "Blandito" está completamente
desaguada y saneada, lo que se ha conseguido á costa de muchos
gastos y sacrificios, que en modo alguno se hubiesen hecho si no hu-
biese estado en vigor la Ley de Colonias Agrícolas, y si no se hu-
biese tenido la certeza de que los derechos por ella concedidos ha-
bían de ser estables y permanentes; que cuando el General Henry
varió el sistema contributivo de la Isla, se respetó el derecho de
los propietarios de la finca "Blandito", teniendo que pagar por
aquel sistema, cada cuerda de primera, un dollar de contribución
anual, las de segunda, cincuenta centavos, y las de tercera, veinti-
cinco, á pesar de lo cual "Blandito" continuó pagando la misma
contribución de treinta pesos provinciales al Estado, con arreglo
á la concesión hecha, y á lo dispuesto por la Ley de Colonias Agrí-
colas; y finalmente, que interponía la correspondiente demanda con
tencioso-administrativa dentro del término concedido para ello, supli-
cando que previos los trámites legales se declarase con lugar la
demanda, y se condenase á la administración á que respetase la
concesión hecha á los dueños de la finca "Blandito", devolvien-
do las contribuciones indebidamente cobradas, y anulando la reso-
lución recurrida del Tesorero General de Puerto Rico, de fecha
once de Diciembre de 1901; interesando por un otrosí, la apertu-
ra de los autos á prueba.—3er. *Resultando*: que admitida la deman-
da, se confirió traslado á la Administración, para que la contes-
tase en el término de veinte días, y antes de evacuar el traslado
alegó la excepción dilatoria de defecto legal en el modo de pro-
poner la demanda, por no estar formulada con claridad la preten-
sión deducida por los reclamantes, como lo requieren los artícu-
los 42 y 46 de la Ley de lo Contencioso-administrativo, excepción
que, corridos los trámites legales, fué declarada sin lugar por sen-
tencia de quince de Abril de 1903.—4o. *Resultando*: que con-

cedido un nuevo término de quince días para contestar la demanda, lo hizo el Assistant Attorney General bajo los siguientes hechos: que en 8 de Mayo de 1901, los Señores Mauricio y Arturo Guerra dirigieron al Tesorero de Puerto Rico un escrito, haciendo el historial de la finca en cuestión, consignando que aquella á la fecha de la concesión, estaba formada por improductivos poyales y pantanos, y hoy la forman tierras de buena calidad, entre ellas, trescientas cuerdas de caña, terminando por solicitar que la Administración sólo podía compelerles al pago por toda contribución, de diez y ocho dollars sesenta centavos, hasta 1906; dicho escrito fué remitido por la Tesorería á la Oficina del Attorney General, que lo devolvió debidamente informado; que el Tesorero resolvió el caso y se lo comunicó á los interesados, transcribiendo en la comunicación expedida al efecto, el informe de la Oficina del Attorney General, concluyendo por denegar la petición deducida por los demandantes, á que anteriormente se ha hecho referencia; y que contra esa resolución del Tesorero, interpusieron los Señores Guerra el correspondiente recurso contencioso-administrativo, terminando por suplicar que previos los trámites de rigor, se declarase sin lugar la demanda, absolviendo de ella á la Administración, y resolviendo que los demandantes vienen obligados á satisfacer por la finca Blandito, las contribuciones que establece la ley de la Asamblea Legislativa, aprobada en 31 de Enero de 1901, que de una manera implícita deroga la Ley de Colonias Agrícolas invocada por los recurrentes, como fundamento de su pretensión.—5o. *Resultando*: que habiendo solicitado la parte actora la apertura de este juicio á prueba, se recibió el juicio á dicho trámite, señalándose el término improrrogable de diez días para proponer toda la que fuese pertinente, y el de veinte días, para evacuar la que hubiere de practicarse.—6o. *Resultando*: que el actor propuso como prueba, la documental siguiente: copia de la resolución del Gobierno General de la Isla de Puerto Rico, de fecha de 18 de Agosto de 1896, por la que se hacía á Don Mauricio y Don Arturo Guerra, la concesión de los beneficios de la Ley de Colonias Agrícolas sobre la hacienda "Blandito", cuya comunicación original vino también á estos autos; una resolución del Hon. Tesorerro de Puerto Rico, desestimando la pretención de los demandantes, á fin de que se les reconociera el beneficio que disfrutaban sobre la finca "Blandito", cuya resolución lleva fecha de once de Dicimbre de 1901; una certificación expedida por la Alcaldía de Vega-Baja, sobre varios antecedentes de Blandito, de fecha 22 de Mayo de 1903, cuya autenticidad fué reconocida en el trámite oportuno; otra certifi-

cación expedida por la propia Alcaldía creditiva de encontrarse archivados allí los documentos siguientes: una comunicación del Gobierno General de la Isla de Puerto Rico—Secretaría—Negociado Tercero—de fecha 30 de Julio de 1896; y otra certificación de la Administración Central de Contribuciones y Rentas de Puerto Rico, de fecha 11 de Marzo de 1898, rebajando á treinta y un pesos la cuota señalada por contribución á la finca "Blandito"; otra certificación expedida por la repetida Alcaldía, creditiva de que la finca Blandito tantas veces mencionada, pagó durante los ejercicios económicos de 1899-900 y 900-1901, la cantidad de diez y ocho dollars, sesenta centavos, por contribuciones municipales; y ultimamente una comunicación, número 1966, de la Administración Central de Contribuciones y Rentas de Puerto Rico, de fecha 11 de Mayo de 1897, por la que se disponía que en el primer trimestre de aquél ejercicio económico, pagasen los propietarios de Blandito la cuota fijada por la Junta Pericial, y en los tres restantes, la contribución correspondiente á los treinta y un pesos señalados en el año económico anterior.—7o. *Resultando:* que también fué propuesta como prueba, la testifical, y con citación de las partes, declararon los testigos Sres. Guillermo Rubert, Tulio Otero, Pedro Brull y Tomás Prado Landrón, sin tacha para serlo, á tenor del interrogatorio presentado y declarado pertinente: ser cierto y constarles que Don Arturo Guerra en Julio de 1897, entregó en la Central San Vicente, por primera vez, para su molienda, diez y ocho mil quintales de caña, sembrada necesariamente en 1896: que en el primer semestre de 1901, entregó con el mismo objeto ochenta y nueve mil setecientos sesenta quintales, cuya caña fué sembrada, lo más tarde, en Julio de 1900, y doscientas cincuenta á trescientas cuerdas de terreno; que la producción últimamente citada no ha sido superada en las cosechas de 1902 y 1903; que desde 1896, los terrenos de Blandito han venido saneándose y desaguándose existiendo en la actualidad, trescientas cuerdas cultivadas de cañas, y el resto dedicado á pastos para el ganado vacuno; que para conseguir tal resultado en la finca, se han hecho cuantiosos desembolsos por sus propietarios, los Señores Guerra; que con tales obras han salido beneficiados no sólo los propietarios mencionados, sino también la salud pública, por haber desaparecido diversos focos de emanaciones pestilentes que la amenazaban seriamente; y que sin tal concesión, la de la ley de Colonias Agrícolas, no hubiese sido posible poner la finca Blandito en las condiciones en que se encuentra.—8o. *Resultando:* que practicada la prueba de inspección ocular, y formado el apuntamiento sin que las partes tu-

viesen que objetar nada al mismo, y practicadas todas las pruebas propuestas, se señaló dia para la vista, en cuyo acto los defensores de las partes alegaron lo que creyeron pertinente á su derecho, declarándose conclusos los autos para sentencia.—9o. *Resultando*: que en la tramitación de este recurso se han guardado las reglas del procedimiento.—Siendo Ponente el Juez Asociado Don José Tous Soto.—1er. *Considerando*: que debe admitirse como un hecho fuera de toda duda, que á los demandantes se les concedió el beneficio que reclamaban, de pagar solamente por su fianca "Blandito" del término municipal de Vega-baja, barrio de Cara-Caribe, durante diez años, á partir de mil ochocientos noventa y seis, la suma de treinta y un peso provinciales, ó sean diez y seis dollars con sesenta centavos, por haberse aplicado á ella los privilegios de la Ley de Colonias Agrícolas, de 3 de Junio de 1868, aplicada á esta Isla, por Real Decreto de cuatro de Mayo de mil ochocientos noventa y cuatro, no tan sólo porque la Administración no ha negado este hecho en su contestación, sino porque las comunicaciones oficiales traidas también á los autos, por los actores, demuestran plenamente que la concesión les fué realmente otorgada en los términos expresados.—2o. *Considerando*: que la concesión á una finca de los beneficios de colonia agrícola, establece un contrato entre la Administración y el concesionario, mediante el cual la Administración dispensa al Colono del pago parcial ó total de las contribuciones, en compensación al servicio que éste presta á la comunidad, poniendo en cultivo tierras insalubres é improductivas; ó, lo que es lo mismo, un verdadero arrendamiento de servicios, en que el Estado, arrendador, paga como merced, los impuestos que deja de cobrar al arrendatario que presta los servicios de saneamiento y cultivo.—3er. *Considerando*: que en tal supuesto, el contrato celebrado entre el Estado y el propietario, semejante al que se establece entre la Corporación incorporada con cláusula de exención de impuestos y el Estado que la incorpora, debe ser respetado y cumplido por ambas partes contratantes, y por consiguiente, por El Pueblo de Puerto Rico, subrogado á virtud del Tratado de París, y del acta del Congreso de 12 de Abril de 1900 (Bill Foraker), en los derechos y deberes de la antigua administración provincial ó Gobierno General de la Isla.—4o. *Considerando*: que la sentencia del Tribunal Supremo de los Estados Unidos, citada por el demandado, es aplicable tan sólo en la parte que expresa "que la incorporación de una Compañía con carta especial, conteniendo la exención de contribuciones de sus tierras ú otras propiedades, crea, mediante la aceptación de la car-

ta, ó cláusulas de incorporación, un contrato que asegura á la compañía la exención de contribuciones durante el periodo especificado en dicha carta'', por la analogía que este caso tiene con el de la concesión de los beneficios de colonia agrícola mediante solicitud comprobada del interesado, equivalente á la carta de incorporación; pero no es aplicable en sus demás extremos, pues la exención de contribuciones por el término de diez años, concedida por la Legislatura del Distrito de Colombia (26 de Junio de 1863) á toda propiedad real ó personal de valor no menor de cincuenta mil dollars, empleada en la fecha de la promulgación de la ley (be actually employed) para fines manufactureros. no tiene analogía con la exención concedida por la Ley de Colonias Agrícolas, ya que las exenciones establecidas por las leyes de tributación, ora con sujección á tiempo, ora sin especificarlo, son solamente concesiones graciosas del poder soberano. revocables á su voluntad, sin que se establezca entre el Estado y los agraciados obligación contratual, por no existir la concurrencia de voluntades para el cumplimiento recíproco de obligaciones libremente estipuladas entre sujetos de derechos capaces, ni por consiguiente, el vínculo jurídico que constituye el contrato. que no puede romperse ni desatarse sino por las causas que originan la nulidad ó la rescisión de las obligaciones.—5o. *Considerando*: que la derogación implícita de la ley de Colonias Agrícolas por las Secciones 1, 2, 3 y 111 de la "Ley para proveer de Rentas al Pueblo de Puerto Rico", de treinta y uno de Enero de mil novecientos uno, no puede alcanzar en sus efectos derogatorios á los derechos adquiridos al amparo de la ley derogada, de conformidad con el artículo 3 del Código Civil de 1899 y tres del actual.—6o. *Considerando*: por lo expuesto, que este recurso contencioso-administrativo debe prosperar retrotrayéndose sus efectos á la fecha en que se estableció la reclamación administrtiva, debiendo en consecuencia devolverse á los demandantes el exceso de contribución cobrada sobre la suma que tenían obligación de satisfacer.—Vistas las disposiciones legales citadas, y las de aplicación de lo contencioso-administrtivo, y reglamento para su ejecución.—*Fallamos*: que declarando con lugar este recurso contencioso-administrativo. debemos revocar y revocamos la resolución administrativa reclamada, y condenar como condenamos á la administración á que reconozca que la finca "Blandito", sita en el barrio Cabo Caribe, de la jurisdicción de Vega-Baja, propiedad de Don Arturo y Don Mauricio Guerra, goza de los beneficios de la ley de Colonias Agrícolas, consistentes en pagar durante el término de diez años, á contar de 1896,

solamente la suma de diez y ocho dollars sesenta centavos, en concepto de contribución, y á devolver las cantidades recaudadas sobre dicha finca en exceso de dicha suma, imponiéndole las costas, y firme esta sentencia, devuélvase á su origen con copia de ella; el expediente administrativo.''

Habiendo el Gobierno Insular perdido el pleito en el Tribunal de Distrito, el Fiscal General, en 18 de Febrero de 1904, presentó la causa aquí en apelación.

Dicha causa fué discutida ante este Tribunal, por Don Antonio Sarmiento, en nombre de los citados contribuyentes, y por Don Jesús Ma. Rossy, Fiscal de este Tribunal, en nombre del Gobierno.

El representante del Gobierno presenta para la consideración del Tribunal, argumentos que pueden condensarse y expresarse en otras palabras, sustancialmente como siguen:

1o.    Que los contribuyentes pudieron acudir á la Junta de Revisión creada por la Ley de Rentas, y de dicha Junta, al Consejo Ejecutivo, y que los contribuyentes en el presente caso, por no haber ejercitado esos recursos, se hallan imposibilitados de valerse de esta revisión contencioso-administrativa.

2o.    Que habiendo los demandados pagado las contribuciones sin protesta, ó voluntariamente, no pueden ahora entablar demandas ante los Tribunales para recuperar el dinero pagado, y para evitar pagos futuros.

3o.    Que la Ley de lo Contencioso-administrativo no autoriza la imposición de las costas al Gobierno.

4o.    Que la exención de contribución de una parte de los terrenos, la reducida valoración del resto, y la consiguiente leve contribución impuesta sobre los mismos, que se reclaman en virtud de la Ley de Colonias Agrícolas, no pueden sostenerse en vista de las secciones derogatorias de la Ley de Rentas establecida en Puerto Rico, el 31 de Enero de 1901, llamada comúnmente la Ley Hollander.

En contestación á la primera de las varias proposiciones sentadas por el Fiscal, el Abogado de los contribuyen-

tes alega que en ninguna de las secciones de la Ley de
Rentas de Puerto Rico, se establece que se pierda el de-
recho á reclamar judicialmente contra las tasaciones ó
valoraciones hechas por el Departamento de la Tesorería
de la Isla, por la omisión de utilizar los recursos admi-
nistrativos que contra aquellas tasaciones establece la Ley
de Rentas Internas.   Mas aunque fuera cierta la doctrina
del Ministerio Fiscal, dice el Abogado de la parte contra-
ria, los señores Guerra no podían perder, por no haberla
cumplido, derecho alguno, por cuanto los recursos á que
se refiere la Ley de Rentas se refieren solamente á las ta-
saciones ó valoraciones de las fincas, contra la que aque-
llos señores nada tienen que objetar.   Los contribuyentes
arguyen que los citados recursos no tenían aplicación al-
guna á su caso, porque en este procedimiento ellos pre-
tenden que no se les debe aplicar la Ley de Rentas, y que
están sujetos solamente á una contribución determinada,
siendo el objeto de la reclamación sometida á este Tri-
bunal, el demostrar esta proposición.

Contestando á la *segunda* proposición del Fiscal, el Le-
trado defensor de los contribuyentes sostiene que los prin-
cipios legales citados en apoyo de la misma, no están fun-
dados sobre los sanos principios de la razón y del dere-
cho; y además, que los contribuyentes, por la carta diri-
gida al Tesorero en 8 de Mayo de 1901, antes de que em-
pezara á regir la Ley Hollander, levantaron toda la pro-
testa que era necesaria por parte de ellos, y que los subsi-
gientes pagos de las contribuciones que se les exigió, no
pueden considerarse como voluntarios.

Con respecto al *tercer* punto, que es una cuestión inci-
dental de costas, el Abogado de los contribuyentes obser-
va que, siendo el asunto tan claro y la cuestión legal tan
obvia, el Tribunal sentenciador hizo perfecta aplicación
del artículo 93 de la Ley de lo Contencioso-administrati-
vo, imponiendo las costas al litigante á quien, dentro de

la más perfecta legalidad, y de la más extricta justicia, consideró notoriamente temerario.

En cuanto al *cuarto* punto, el Letrado defensor de los contribuyentes sostiene que la solicitud que los señores Guerra, en virtud de la Ley de 3 de Junio de 1868, dirigieron á las autoridades españolas, para la rebaja de sus contribuciones, y la orden expedida por los funcionarios provinciales, concediendo la misma, constituía un contrato, y que como tal, es protegido por la cláusula de la Constitución de los Estados Unidos, que dispone que ningún estado podrá establecer ley alguna que disminuya la eficacia de la obligación de contratos. (Art. 1, Sección 10, Cons. U. S.) En otras palabras, que la Ley mencionada era irrevocable, y que la Ley de Rentas de 31 de Enero de 1901, no tenía efecto para modificar ó derogar dicha Ley.

El Abogado de los contribuyentes también reclama para ellos protección en virtud del Tratado de París, arguyendo que la exención de los terrenos de sus clientes del pago de contribución, es un derecho adquirido, y que como tal debe ser considerado como propiedad de la cual no podrían ser privados en virtud de los términos de dicho Tratado.

A excepción de la ley conocida por la "Ley de Colonias Agrícolas", no se han citado autoridades españolas para sostener la aserción de los contribuyentes. Esta ley, en virtud de la cual dichos contribuyentes reclaman la rebaja de su contribución, fué promulgada por la Reina Isabel II, en 3 de Junio de 1868, y se hizo extensiva á Puerto Rico, en el año 1894; y los artículos á que se hace referencia en el presente caso, son el 7, el 8 y el 26, que junto con el título de la Ley y otros artículos que tienen aplicación á las cuestiones de que se trata, dicen lo que sigue:

"Ley de 3 de Junio de 1868.

Refundiendo las prescripciones de las leyes de 8 de Enero y 23 de Mayo de 1845, Real Decreto de esta última fecha, leyes de 24 de

Junio de 1849 y 21 de Noviembre de 1855, 11 de Junio y 3 de Agosto de 1866, sobre fomento de la agricultura y de la población rural, y declarando derogadas dichas disposiciones en todo lo que se opongan á la presente.

Art. 7o.—Los terrenos desecados y saneados por el desagüe de lagunas, pantanos y sitios encharcados, estarán exentos de toda contribución por tiempo de diez años desde el día que se pusiere en cultivo de huerta, de cereales, de prado, legumbres, raíces ó plantas industriales y viñedo; por quince años, si se plantase de árboles frutales, y por veinticinco años, cuando se plantasen de olivos, almendros, algarrobos, moreras ó otros análogos.

Si en los terrenos desecados y saneados se construyesen casas á más de un kilómetro de una población, las casas y las tierras á ellas afectas, disfrutarán cinco años más de exención respectivamente en cada uno de los tres casos del párrafo anterior.

Art. 8o.—Los terrenos que desde tiempo inmemorial hubiesen permanecido sin aprovechamiento, ó los que hubiesen tenido interrumpido el cultivo por espacio de quince años consecutivos, sólo pagarán al ser roturados y cultivados, la contribución de inmuebles que hubiesen satisfecho el año anterior, por tiempo de diez años desde el día que se pusiesen en cultivo de huerta, de cereales, de prado, legumbres, raíces ó plantas industriales; por quince años. si se plantasen de viñedo ó árboles frutales, y por veinte y cinco años cuando se plantasen de olivos, algarrobos moreras ó otros análogos.

Art. 22.—Los propietarios que actualmente disfrutasen de las ventajas concedidas por las leyes de 8 de Enero y 23 de Mayo de 1845 y Real Decreto de esta última fecha, así como por las leyes de 24 de Junio de 1849, 21 de Noviembre de 1855, 11 de Julio y 3 de Agosto de 1866, ú otras disposiciones legislativas, y construyesen una ó más casas dentro de las fincas rurales respectivas, disfrutarán cinco años más de no aumento de contribución en los viñedos y tierras de riego, y de diez años en los plantíos de almendros, olivos, algarrobas, moreras y otros análogos, lo mismo que en el arbolado de construcción, y los habitantes de dichas casas tendrán además cuantas ventajas conceda esta ley, cuya aplicación se contará desde que empezó el goce de las á que se contraen las leyes anteriores.

Art.23.—Los expedientes incoados en conformidad con las leyes de Colonias y de población rural, de 21 de Noviembre de 1855, y 11 de Julio de 1866, y pendientes de resolución, serán despachados

á voluntad de quienes los hubiesen promovido, según las disposiciones de aquellas leyes, ó según los de la presente.

Art. 24.—Los propietarios de fincas rurales que construyan en ellas una ó más casas ó edificaciones, según la presente ley, podrán redimir los censos con que aquellas tierras estuviesen gravadas en favor del Estado, pagando su capitalización en veinte plazos, en vez de los determinados por la Legislación vigente.

Art. 25.—Todas las ventajas y facultades que en la presente ley se conceden á los propietarios de fincas rurales y de establecimientos industriales sitos en el campo, se hacen extensivas á los arrendatarios y colonos de las fincas y de las fábricas.

Art. 26.—Los propietarios que aspiren al disfrute de los beneficios dispensados por la presente ley, acudirán al alcalde del Distrito Municipal donde radicare la finca ó fincas, con una solicitud del Gobernador de la Provincia, expresando la situación, cabida y linderos, estado, clase de cultivos, si los hubiere, y contribución que á la sazón pagasen los terrenos que sean materia del procedimiento oficial.

El Alcalde dispondrá inmediatamente que dos individuos de la Junta Pericial del Pueblo se cercioren de los hechos expuestos por el propietario, inspeccionando ocularmente los terrenos, y dando su informe por escrito. Dentro de los quince días de la presentación de la solicitud del propietario, y después de oído el Ayuntamiento, la pasará el Alcalde al Gobernador, emitiendo su dictámen y acompañando el informe de los individuos de la Junta pericial que hubieren inspeccionado la finca, y el acuerdo del Ayuntamiento.

El Gobernador resolverá en el término de un mes, y si no lo hiciere, se entenderá otorgada la solitud del propietario.

Si la resolución del Gobernador fuese negativa, podrá el propietario interesado reclamar ante el Ministerio de Fomento, el cual resolverá dentro de 60 días después de presentada la reclamación. Y si transcurriese ese plazo sin que recaiga resolución alguna, se entenderá concedida la petición, y el propietario reclamante entrará en el pleno disfrute de los beneficios de la presente ley, según los había solicitado.

Art. 27.—Quedan derogadas las prescripciones contenidas en la Ley de 8 de Enero y 23 de Mayo de 1845, Real Decreto de esta última echa, Leyes de 24 de Junio de 1849 y 21 de Noviembre de 1855, 11 de Julio y 3 de Aagosto de 1886, y cualesquiera otras en cuanto se hallaren en contradicción con la presente ley.

Art. 28.—El Gobierno dictará los reglamentos necesarios para la aplicación de esta ley.

La concesión misma que los contribuyentes alegan haber sido hecha á su favor, por el Gobierno Español, no aparece copiada en los autos, sino parece haber sido probada por medio de cartas dirigidas por empleados de Rentas al Alcalde, en cuyo término municipal estaban situados los terrenos cuyas cartas dicen lo que sigue:

"1o.—Administración Central de Contribuciones y Rentas.—Puerto Rico.—No. 1966.—Con esta fecha digo al Alcalde de Vega-Baja lo que sigue:—"Visto el expediente promovido por instancia de Don Arturo Guerra, á su nombre, y en representación de su señor padre, Don Mauricio, solicitando, que se le rebaje la contribución que el Ayuntamiento de ese pueblo le ha fijado á su finca denominada "Blandito" en el reparto de la contribución territorial para 1896 á 97, fundándose en que á dicho inmueble se le han concedido los beneficios de la "Ley de Colonias Agrícolas."—*Resultando*: que el Excmo. Sr. Gobernador General, por decreto de ocho de Agosto del año próximo pasado, se ha servido disponer que la finca de los señores Guerra disfrute por diez años de la exención que establecen los artículos 7o. y 8o. de la Ley de Colonias Agrícolas.—*Resultando*: que el expresado decreto de su Excelencia se anunció á ese Ayuntamiento en 18 del propio Agosto, fecha en que ya se había fijado al público el reparto de la contribución territorial para el año actual.—*Considerando*: que el indicado artículo 8o. dispone que la propiedad comprendida en la concesión de que se trata, ha de pagar durante el plazo de ésta, la misma contribución que tenía asignada el año anterior; y—*Considerando*: que al otorgarse la repetida gracia á la finca "Blandito", estaba en curso el primer trimestre del ejercicio del 96 al 97; el Excmo. Sr. Intendente General se ha servido disponer que en ese trimestre los interesados satisfagan la cuota fijada por la Junta Pericial, y en los tres restantes, la contribución correspondiente á los treinta y un pesos señalados en el año económico anterior, y que es la cuota que debe servir de base para la tributación de la repetida propiedad durante el plazo de la concesión."—Lo que transcribo á V. para su conocimiento y demás efectos.—Dios guarde á V. muchos años.—Puerto Rico 14 de Mayo de 1897.—Firmado, Alejandro Infiesta.—Sr. Don Arturo Guerra."

"2o.—Administración Central de Contribuciones y Rentas.—Puerto Rico.—Con esta fecha se dirige al Alcalde de Vega-Baja la comunicación siguiente:—Enterada de la instancia promovida por Don Arturo Guerra en representación de su señor Padre, Don Mauricio, reclamando contra ese Ayuntamiento por la cuota señalada á la finca denominada "Blandito", en el reparto de la contribución territorial de 1897 á 98.—*Resultando*: que en el padrón y reparto vigente aparece la finca de que se trata, con la cuota de cincuenta y un pesos diez y seis centavos igual á la que se fijaba en el año económico de 1896 á 97;—*Resultando*: que en 11 de Mayo de 1897, la suprimida Intendencia General de Hacienda rebajó á 31 pesos la expresada cuota, ó sea á la que con que figuró en el reparto de 1895 á 96, por estar comprendida la estancia "Blandito" en los beneficios que determina la ley de Colonias Agrícolas.—*Considerando*: que para señalar la cuota que deben pagar los contribuyentes, se tomará como base la del reparto anterior, lo cual no se tuvo en cuenta en el caso que se ventila, no obstante además la ejecución reconocida á la mencionada finca.—El Iltmo. Sr. Secretario del Despacho de Hacienda, por acuerdo fecha de ayer, se ha servido disponer que se rebaje á 31 pesos la cuota señalada en el reparto vigente á la finca "Blandito", cuya diferencia debe prorratearse entre los demás contribuyentes de dicha riqueza por ser invariable el cupo, siendo responsables del cobro en mancomún los repartidores y el Ayuntamiento según determina el artículo 71 del Reglamento respectivo."—Lo que traslado á V. para su conocimiento y efectos consiguientes.—Dios guarde á V. muchos años.—Puerto Rico, 11 de Marzo de 1898.—N. Daubón.—Sr. Don Arturo Guerra."

El primer punto presentado por el apelante, es propiamente preliminario, y será considerado primero. Dicho punto puede considerarse como fundamental por ser relativo á la competencia del Tribunal de Distrito en el procedimiento contencioso-administrativo. Por un exámen de la Ley de Rentas, se vé claramente que dicha ley autoriza la apelación contra la resolución de un tasador, para ante la Junta de Revisión é Igualamiento, compuesta del Tesorero, el Secretario, el Comisionado del Interior, y otras dos personas nombradas por el Gobernador. Esta Junta ha sido constituída "con el fin de resolver to-

das las reclamaciones que presenten los contribuyentes, con referencia á la tasación de sus propiedades.'' Estatutos Rev. de P. R. Art. 308. Se ha establecido además, que ''cualquiera persona perjudicada por la decisión del tasador, respecto de la valuación de su propiedad, puede elevar queja por escrito sobre el particular á la susodicha Junta.'' Estatutos Rev. Artículo 309. Y nuevamente se autoriza á la citada Junta para oir la apelación (la apelación) y resolver de nuevo cualquiera cuestión que se presentare ante la misma, y que se relacione con la mayor ó menor cantidad en que puede tasarse la finca para imponerle las contribuciones, ó con el importe de èsta.'' Estatutos Rev. de P. R. Artíuclo 310. Y se vuelve á declarar en el mismo artículo que ''la referida Junta tendrá poder para suprimir, disminuir ó aumentar las valuaciones hechas en cualquiera planilla que le haya sido enviada, háyase presentado ó no queja alguna con relación á la misma; y para decidir toda otra queja con respecto á la imposición de contribuciones, y para corregir todos los errores que haya, á medida que se le indiquen.'' Estatutos Rev. de P. R., Artículo 310.

Parece que el Fiscal, siguiendo la opinión del Fiscal General interino, ha incurrido en un error al opinar que contra una decisión de la Junta de Revisión é Igualamiento, pueda interponerse apelación para ante el Consejo Ejecutivo, puesto que la Ley dice: ''La decisión de la Junta, en todo asunto que le sea presentado, será firme.'' Estatutos Rev. de P. R., Artículo 310, pág. 442.

La pretensión del Abogado de los contribuyentes en cuanto á este punto, respecto á los defectos de la Ley de Rentas, no nos parece sólida, puesto que evidentemente fué la intención de la Legislatura, el que la Junta de Revisión é Igualamiento tuviera la inspección general de la recaudación de contribuciones, y en el establecimiento de una ley de rentas no era necesario ninguna denegación especial del derecho del contribuyente de llevar su queja á

los Tribunales. El artículo derogatorio en general comprende claramente este asunto.

Con respecto á la interpretación de una ley derogatoria, no es necesario citar más que unas cuantas autoridades. El Tribunal Supremo de Wisconsin, en un caso examinado cuidadosamente, dice:

"Una ley de rentas, al igual de cualquiera otra ley, puede ser derogada por inducción. Pero siempre existe la presunción más ó menos fuerte según las circunstancias, de que una ley no tiene por objeto el derogar una ley anterior sobre la misma materia, á menos que lo haga en términos expresos. Sin una cláusula derogatoria, las dos leyes pueden existir, y estar en vigor juntamente, á menos que sean incompatibles; y en ese caso la ley posterior derogará la anterior en cuanto sea incompatible con ella; pero aún entonces debe dársele eficacia á las dos leyes hasta donde sea posible. En el caso de concesiones hechas á las Corporaciones municipales, de la facultad de imponer contribuciones, la presunción de que no se tuvo la intención de modificar ó derogar esas concesiones mediante una legislación general subsiguiente, es tan fuerte que es casi concluyente."

"Tampoco afecta la cuestión, la doctrina de que leyes *in pari materia* deben ser consideradas juntas é interpretadas como una sola ley. Esa es una regla de interpretación á que se recurre en caso de duda, y no es nunca aplicable cuando la ley es clara y no ambigua." State v. Cram 16 Wis., 343, citando Sedwick on Statutory Law, 231.

Si fueren necesarias más autoridades, las hay en abundancia, y citaremos las siguientes:

"No está de acuerdo con las reglas de interpretación establecidas, el atribuir al poder legislativo la intención de establecer sobre la misma materia sistemas contradictorios y opuestos, ó de dejar vigentes disposiciones legales que puedan hacer fracasar y dejar sin efecto la última voluntad de la legislatura. Semejante resultado convertiría la legislación en vana é inútil ceremonia, y expondría la ley á ser tachada de incierta é ininteligible." Laddy vs. Long Island City, 10 th N. E. Rep. 157.

"Es una regla de interpretación muy conocida, el que un con-

cepto que está comprendido en la intención de los legisladores, lo está también en la ley lo mismo cómo si estuviese contenido en su texto; y que un concepto que está contenido en el texto de una ley, no está comprendido en la ley, á menos que esté comprendido en la intención de los legisladores." Riggs. vs. Palmer, 5 L. A. R., 340, y notas.

No puede, pues, á la luz de estas y de todas las autoridades haber duda alguna sobre la intención de la Legislatura Insular, de establecer un sistema nuevo de contribuciones y de revocar todos los demás sistemas; y habiéndose hecho por la ley de Rentas las exenciones que parecían procedentes, todas las demás exenciones y rebajas fueron revocadas y derogadas; y si el poder de hacerlo existió, los exclusivos privilegios de los dueños de "Blandito" fueron eliminados juntos con todos los demás de carácter análogo.

Del mismo modo debe negarse la aserción del abogado de los contribuyentes de que el recurso de apelación que podían haber interpuesto sus clientes para ante la Junta de Revisión é Igualamiento, no tenía aplicación, puesto que la autoridad de dicha Junta es ámplia para arreglar y resolver todas las cuestiones de esa índole.

La objeción presentada contra la competencia del Tribunal sentenciador y fundada en que no se había agotado el recurso administrativo, merece seria consideración. La Ley de Rentas autoriza las apelaciones para ante la Junta de Revisión, contra las resoluciones del Tesorero en asuntos de contribuciones, y las partes debían haberse valido de ese recurso antes de entablar su demanda. Véanse los artículos 1, 2 y 4 del Procedimiento contencioso-administrativo, y los 308 á 313 inclusive, del Código Político. En algunos de los Estados, existe en los asuntos escolásticos un procedimiento semejante al contencioso-administrativo usado en Puerto Rico. Se ha declarado, en uno de los Estados, que no se puede entablar de-

manda contra los miembros de la Junta Escolar (trustees) ú otras autoridades escolásticas, mientras que las partes no hayan recurrido primeramente á la Junta Escolar del Estado; y las alegaciones deben demostrar que han hecho esto. El estado legal de las cosas, en virtud del cual el Tribunal puede proceder, no está establecido mientras no le haya sido negado á la parte algún derecho por parte del funcionario ó Junta administrativa más alta que tenga jurisdicción sobre el asunto de que se trata. No se puede decir que el derecho haya sido negado por el Gobierno, cuando no se le ha dirigido una solicitud en debida forma para que sus funcionarios resuelvan sobre dicho derecho y tengan una oportunidad para reconocerlo ó denegarlo.

Es cierto que se presume la jurisdicción sobre la persona cuando no consta en los autos nada en contrario; pero no se presume nunca jurisdicción sobre el asunto de que se trata, y el consentimiento de las partes no puede conferir jurisdicción en tales casos. La ley del procedimiento contencioso-administrativo dispone en su artículo 46, que las excepciones dilatorias deben ser presentadas antes de la contestación, y entre las excepciones que pueden presentarse, menciona la de incompetencia; y el artículo 48 dispone que las excepciones que no hayan sido presentadas antes de la contestación, pueden presentarse como excepciones perentorias junto con la contestación y el Tribunal está en el deber de resolverlas al dictar sentencia firme. No hay nada en esos artículos que se oponga á la proposición de que el Tribunal carece de jurisdicción cuando no se ha utilizado el recurso administrativo; al contrario, el texto del párrafo 5o. del artículo 46, dice expresamente que el Tribunal es incompetente cuando la reclamación no tiene el carácter y las condiciones que requiere el Título 5o. de la referida Ley. El artículo 1o. expresa muy claramente los casos en que se puede recurrir al procedimiento contencioso-administrativo, y exige

como requisito indispensable para la competencia del Tribunal, el que las cosas hayan llegado previamente al estado legal necesario; y según los términos del artículo 2o. de la misma ley, ese estado no puede existir mientras no se haya agotado completamente el recurso administrativo.

Si los puntos aquí presentados no son jurisdiccionales, al menos se refieren en gran parte á los méritos de la demanda, y son tan importantes que puede ser que afecten su fundamento. El hecho de haber utilizado el demandante el recurso administrativo, es absolutamente necesario para formar un predicado en que basar un decreto; y cuando, según lo que consta en los autos, no se ha establecido esa base, es difícil comprender como puede mantenerse en vigor la sentencia.

Ahora vamos á examinar la segunda proposición preliminar presentada por el apelante, de que los contribuyentes están imposibilitados de acudir á los Tribunales en busca de auxilio en el presente caso, por haber pagado las contribuciones impuestas á los terrenos, y porque no pueden recobrar el dinero que han pagado voluntariamente á la Tesorería de la Isla. A esto contestan los apelados que aunque han pagado las contribuciones con regularidad, su petición dirigida al Tesorero en 8 de Mayo de 1901, tenía el carácter de una protesta levantada antes de que la ley empezara á regir, y debe ser considerada como tal.

Por cuanto la exención reclamada es por diez años, y no termina sino dentro de uno ó dos años más, debe haber aún contribuciones sin pagar, y en cuanto á éstos á lo menos los contribuyentes tienen el derecho de objetar en debida forma. Pero como se trata en la petición de recobrar las sumas alegadas de haber sido pagadas con exceso de los ($18.60) diez y ocho dollars y sesenta centavos anuales, vamos á examinar la fuerza que debe darse á la proposición que nos ha presentado el Fiscal de la Isla.

En la discusión el eminente Abogado, representante de los contribuyentes, dice sustancialmente lo siguiente:

"El representante del Gobierno hace referencia á la opinión de un escritor á quien llama eminente autor de obras de derecho, respecto á la materia de pagos voluntarios. Esas proposiciones carecen de solidez lógica y no están en armonía con el derecho extricto."

Oigamos lo que por sí mismo dice el libro de texto. Con respecto á la cuestión de pagos voluntarios, el Juez Cooley en su obra sobre imposición de contribuciones, consigna la ley como sigue:

"Las autoridades están de acuerdo en general, en que no se puede recobrar una contribución que ha sido pagada voluntariamente. Y no importa en tal caso el que la contribución haya sido impuesta ilegalmente, ni aún que la ley en virtud de la cual fué impuesta era anticonstitucional. Dicho principio es un principio antiguo en la ley común, y es de aplicación general. Se supone que toda persona conozca la ley, y si expontáneamente efectúa un pago que la ley no la hubiese obligado á hacer, no podrá después alegar su ignorancia de la ley como razón por la cual el Estado debe suministrarle los recursos legales para recobrarlo. Especialmente es este el caso cuando el funcionario receptor del dinero, á quien no se puede exigir más conocimientos de la ley que á la parte que efectúa el pago, no ha sido prevenido por una advertencia ó protesta, y se entrega el dinero para el uso público con aparente aquiescencia en la justicia de la exacción. Un error de hecho puede apenas existir en semejante caso, excepto cuando haya mediado negligencia; puesto que las ilegalidades que hacen nula tal demanda, deben constar en los Registros, y tan obligado está el contribuyente á informarse de lo que demuestran ó no demuestran los registros, como lo están las autoridades públicas. La regla de ley es también una regla de sana política pública; es así una regla de seguridad como de buena fé, é impide á los Tribunales ocuparse en deshacer los convenios de las partes cuando hayan sido hechos voluntariamente, y cuando las partes no hayan sido impulsadas á celebrarlos por fraude ó accidente, ó por ignorancia excusable de sus derechos y obligaciones legales.

Se supone que todos los pagos son voluntarios mientras no se

demuestre lo contrario. Ni es el mero hecho de que se haya pa
gado una contribución involuntariamente ó con protesta de nin-
guna importancia legal, sino que en tal caso debe haber algún gra-
do de compulsión á la cual el contribuyente se someta al tiempo
de efectuar el pago pero con alguna clase de notificación que equi-
valga á una reserva de sus derechos. En algún caso se ha dicho
que "las contribuciones ilegalmente recaudadas pueden ser siempre
recobradas, si el colector es enterado por el pagador de que él con-
sidera la contribución como ilegal, y que entablará demanda para
compeler su restitución;" pero se ha declarado repetidas veces que
una simple protesta, cuando el pago no se efectuó para evitar arres-
to ó el embargo ó la venta de mercancías, ó por temor á un proce-
dimiento que pudiera seguirse inmediatamente, no quitaría al pa-
go el carácter de voluntario que se le presume. En algunos casos se
ha declarado que un pago que se efectúa solamente para redimir
terrenos del gravámen de una contribución, ó para evitar la venta
de terrenos, ó para redimir terrenos de una venta realmente efectua-
da, no será considerado como un pago hecho bajo compulsión, y la
parte que pagó no puede reclamarlo; pero esta opinión no ha sido
asentida generalmente, y parece razonable que la regla sea restrin-
gida á los casos en que si se efectuase la venta, los procedimien-
tos presentarían á primera vista defectos fatales. Una parte no
debe ser expuesta á mayores riesgos de pérdida en liberar sus te-
rrenos de una aparente duda con respecto al título que en prote-
ger sus mercancías contra una venta ilegal.

Cuando se habla de un pago voluntario, la palabra calificativa no
se usa en su sentido ordinario, y muchos pagos son considerados
como voluntarios, que se han hecho involuntariamente y sólo por
una elección entre varios males ó riesgos. Así, un pago ha sido de-
clarado voluntario, cuyo pago fué efectuado por el dueño para sal-
var la propiedad de ser vendida, como él suponía, cuando en reali-
dad el colector simuló proceder á la venta, pero con una autoridad
nula á primera vista, y sin posesión ó dominio de la propiedad. La
misma decisión se ha dictado en una caso en que el funcionario ame-
nazó con vender la propiedad para una contribución que aun no
se debía, sin tener entonces el poder de llevar á efecto su amenaza.
Asímismo en un caso en que un Tribunal, sin autoridad para ello
expidió una orden para el pago de una contribución, cuyo pago se
hizo de conformidad sin que la parte que se hallaba en esas cir-
cunstancias, estuviera bajo compulsión legal—dicho pago fué decla-
rado voluntario. Del mismo modo, en un caso en que una perso-

na en el día fijado para la venta de su propiedad para una contribución ilegal, ofreció efectuar el pago al día siguiente si la venta fuese aplazada, y tal aplazamiento tuvo lugar, efectuándose el pago según se había ofrecido, esto fué declarado pago voluntario. Y se ha declarado en algunos casos que cuando se trata de recobrar un pago como hecho bajo compulsión, se debe demostrar que dicho pago fué efectuado para rescatar ya una persona ó ya una propiedad del poder del funcionario. Y esto puede decirse que expresa el sentido general de las autoridades.

Las leyes en algunos Estados han cambiado las reglas hasta cierto punto, y han permitido la recuperación en todos los casos de contribuciones ilegales, siempre que al tiempo de efectuarse el pago, se hubiere formulado protesta según lo prescribe la ley. Con respecto á tales leyes solamente es necesario decir que la parte que se ampare en ellas, debe cuidar de que su caso esté dentro de las disposiciones de las mismas.

Cooley on Taxation pp. 809, 810, 811, 812 y 812.

En cuanto concierne á la protesta y á la doctrina sentada por Cooley, dice el distinguido Abogado, que representa á los apelados en la presente causa, es muy dudoso, según los sanos principios de la razón y del derecho extricto, si pueden tener aplicación alguna al presente caso. Este autor de textos, dice el Abogado, sostiene que no hay derecho para reclamar del Estado la restitución de dinero, que se ha pagado sin protesta, y de esto el Fiscal salta á la conclusión de que no puede sostenerse que los señores Guerra tengan derecho alguno para reclamar las contribuciones pagadas, sino que en cierta manera la exacción de la contribución era legal, y que debe continuarse recaudándola. Pero, continúa el citado Abogado, es que los Señores Guerra protestaron de la ilegalidad de cobranza ilegal que se les hacía de esas contribuciones, como lo comprueba que el primer escrito al Tesorero de Puerto Rioc reclamando contra la falta de legalidad de dicha exacción, fué muy anterior á la fecha en que la contribución era exigible; y por consiguiente la protesta que echa de menos el Ministerio Fiscal, tiene una realidad tan

evidente como que de ella arranca la existencia de este pleito. Tal es en sustancia el punto de vista del Abogado defensor de los contribuyentes.

En nuestra opinión, la ley tal como la consigna el Juez Cooley resuelve correctamente la cuestión de que, en cuanto se refiere á la recuperación de cualesquiera dineros ya ingresados en el Tesoro los contribuyentes no han practicado las diligencias necesarias para su propia protección. Los pagos efectuados por éstos deben considerarse como voluntarios. Los contribuyentes no estaban bajo ninguna clase de coacción ni en sus personas ni en su propiedad. Ellos debieron haber esperado, antes de efectuar el pago, hasta que se les hubiese amenezado con la venta de su propiedad, en cuyo momento para impedir tal venta pudieron efectuar el pago de las contribuciones bajo protesta, ó solicitar un interdicto prohibitorio de la venta para las contribuciones que alegan ser ilegales, y todos los puntos planteados para su resolución en este pleito, pudieron ser decididos en aquella forma. Cuando voluntariamente y sin protesta se ha pagado, por inadvertencia, dinero al Tesoro en virtud de una errónea reclamación de derecho, se debe recurrir ante la Legislatura para conseguir la restitución, y no á los Tribunales, que de este modo han perdido su jurisdicción sobre el asunto de que se trata.

En cuanto al tercer punto presentado por el Fiscal, sólo hemos de decir que según el concepto que hemos formado de este caso, la discusión con respecto á costas no es importante. Si fuera necesario considerar la cuestión, habría de sostenerse la aserción de que en ninguna circunstancia se impondrán las costas al Gobierno en un caso como el presente. No puede considerarse que el artículo 93 de la Ley de lo Contencioso-administrativo lo autorice.

Esto nos lleva á la *cuarta* y última proposición presentada por el representante del Gobierno Insular. No obs-

tante cualesquiera opiniones expresadas en las cuestiones preliminares, planteadas en el presente asunto, examinaremos la proposición principal tan minuciosamente como lo exige su importancia.

No es necesario discutir la gran cuestión anteriormente debatida de si está ó no vigente en Puerto Rico la Constitución íntegra de los Estados Unidos, ó la cuestión subsidiaria de si la cláusula contenida en el párrafo 10 del artículo primero de dicha Constitución, que dispone "que ningún Estado deberá adoptar una ley que sea en menoscabo de las obligaciones nacidas de los contratos", está en vigor en Puerto Rico. Para los fines de esta decisión, puede considerarse que los contribuyentes tienen derecho á todos los beneficios que pudieran derivarse de dicha cláusula, lo mismo que si estuviera en vigor en Puerto Rico. Consideremos el caso sobre esta base.

Pero el Letrado defensor de los apelados reclama para sus clientes la protección del Tratado de París, sosteniendo que esta exención de contribuciones y reducción del importe de las mismas, es una propiedad ó derecho ó derechos correspondientes á la pacífica posesión de propiedad, con arreglo á los términos del artículo VIII de dicho Tratado. Para la mejor inteligencia de la proposición presentada por dicho Letrado, citaremos los primeros dos párrafos del referido artículo que dicen lo siguiente:

"En cumplimiento de lo convenido en los artículos I, II y III de este Tratado, *España* renuncia en Cuba *y cede en Puerto Rico*, y en las otras Islas de las Indias occidentales, en la Isla de Guam, y en el Archipiélago de las Filipinas, todos los edificios, muelles, cuarteles, fortalezas, establecimientos, vías públicas, y demás *bienes inmuebles,* que con arreglo á derecho son del dominio público y como tal correspondan á la Corona de España.

Queda, por lo tanto, declarado que esta renuncia, ó cesión, según el caso á que se refiere el párrafo anterior, *en nada puede mermar la propiedad ó los derechos que correspondan con arreglo á las leyes, al poseedor pacífico de los bienes de todas clases* de las pro-

vincias, municipios, establecimientos públicos ó privados, corporaciones civiles ó eclesiásticas, ó de cualesquiera otras colectividades que tienen personalidad jurídica para adquirir y poseer bienes en los mencionados territorios renunciados ó cedidos, y los *de los individuos particulares,* cualquiera que sea su nacionalidad."

Esta reclamación de protección en virtud del Tratado de París, puede resolverse lo mismo aquí y ahora, que en otra parte y en otro tiempo. Si la exención de contribuciones es un derecho adquirido por los apelados, en virtud de la ley española, llamada la Ley de Colonias Agrícolas, entonces es un derecho de propiedad, y, ya de acuerdo con dicho Tratado, ya sin atención á él, debe ser protegida.

Véase Bryan vs. Kennett 113 U. S. 192; Soulard v. United States 29 U. S. 511; Strothers v. Lucas, 37 U. S. 435, 438; Head Money cases 112 U. S. 598, 599.

El artículo 8 de ese Tratado tiene referencia solamente á "bienes raices pertenecientes á la Corona de España", y "la cesión de los mismos no puede mermar los derechos de individuos particulares." De una lectura cuidadosa de los dos párrafos citados, resulta claramente ser ese su sentido, y si tal es la interpretación propia, ese artículo no puede tener referencia á los terrenos de que se trata en este pleito, ni á la exención de contribuciones, total ó parcial, que se reclama en el mismo.

Pero no hay necesidad de apelar al Tratado para la protección de derechos adquiridos. Estos están protegidos por la Constitución y leyes de los Estados Unidos con ó sin un tratado para tal efecto. Los Tribunales de Justicia en ningún país civilizado infringen á sabiendas derechos adquiridos, y el Tratado de París, en el artículo de referencia, es simplemente declaratorio de esos principios. Véase Fletcher v. Peck 10 U. S. (6 Cranch) 132 *et seq.*

Por consiguiente, este caso puede considerarse no solamente con arreglo á dicho Tratado y á la Constitución nacional, sino con debida atención á los principios univer-

sales de Justicia, que prohiben la privación á ningún ciudadano de sus derechos adquiridos.

Cualesquiera derechos que los apelados hayan podido tener con arreglo á las leyes del Gobierno anterior, deben ser reconocidos bajo las presentes, y nuestros Tribunales deben considerar el *estado de derecho* de los terrenos como no cambiado por la cesión de la Isla al Gobierno americano.

El verdadero fondo de la cuestión entonces es: ¿había la exención de contribuciones de una parte de los terrenos y la rebaja de las del resto de dichos terrenos, llegado á adherirse al inmueble de tal manera que pudiera considerarse como un derecho adquirido nacido de un contrato, de tal manera que no pudiera ser afectada por una legislación subsiguiente?

Observaremos desde un principio que el asunto de contribuciones impuestas sobre terrenos en Puerto Rico, y el reconocimiento de exenciones y rebajas hechas, ó que se alegan haber sido hechas, ya sean consideradas como temporales, ya como permanentes, deben regirse por las leyes americanas, puesto que el Gobierno americano está investido de la soberanía de la Isla; pero antes de entrar de lleno en la discusión del caso á la luz de la jurisprudencia americana, echemos una ojeada sobre las leyes españolas.

Un exámen del título demostrará que la ley española de 3 de Junio de 1868, en que los apelados se apoyan, como base de su supuesto contrato, derogó y modificó varias otras leyes anteriores de un carácter enteramente análogo con respecto á la protección y fomento de la agricultura. De este mismo hecho aparece que la ley en virtud de la cual se reclamó la protección, no fué considerada en España como irrevocable, y que la exención de contribuciones bajo aquella ley, no fué en manera alguna considerada como teniendo la santidad de un contrato.

En este procedimiento, los contribuyentes confían en

dos decisiones pronunciadas por el Tribunal Supremo de los Estados Unidos, para sostener su proposición de que la exención del efecto de las leyes generales de contribuciones, y la rebaja en sus contribuciones reclamadas por ellos, constituyen un contrato irrevocable. Se hace referencia á los dictámenes emitidos por el Juez Davis, en las causas de Home of the Friendless vs. Rouss y Washington University vs. Rouse en (8 Wall) 75 U. S. pp. 435 y 439. Esos dictámenes, siguiendo la doctrina sentada en la causa de Darmouth College vs. Woodward, (4 Wheaton) 17 U. S. 625, y otras causas análogas á aquél célebre asunto, sostienen la proposición de que una carta constitucional concedida por un Estado á un Instituto de caridad ó de educación, y por la cual se exime la propiedad de tal corporación del pago de contribuciones, con el fin de poner los fundadores de la misma en estado "de realizar más completa y eficazmente su laudable propósito", constituye un contrato basado en una estipulaicón de compensación mútua suficiente, y por lo tanto está protegido por la cláusula del inciso 10 del artículo 1o. de la Constitución de los Estados Unidos, que prohibe á cualquier Estado, la adopción de una ley que merme la fuerza obligatoria de los contratos.

La exención dada en esta forma en una carta constitucional concedida por el Estado, no puede ser revocada después por una Legislatura subsiguiente, debido á la fuerza de la citada cláusula de la Constitución nacional. Esta proposición está reconocida como la ley que sobre esta materia rige en los Estados Unidos, no obstante los muy razonados votos particulares que de vez en cuando han sido emitidos por algunos de los Jueces del Tribunal Supremo, limitando ó poniendo en duda la doctrina que así restringe el poder de imponer contribuciones. El Juez Presidente Chase y el Juez Field están de acuerdo con el Juez Miller en las causas citadas (8 Wall) 75 U. S., declarando que ninguna Legislatura puede, mediante tal con-

trato, privar al Estado para siempre del poder de imponer contribuciones, puesto que tàl proceder podía tener por resultado la destrucción del Gobierno á consecuencia de la completa renuncia al poder de imponer contribuciones, cuyo poder es absolutamente necesario para su sostenimiento.

Dando á estas opiniones toda la fuerza que pueda reclamarse para ellas, no apoyan la pretensión de los contribuyentes en el presente caso, á menos que los demandantes, que carecen de un privilegio constante en documento auténtico, puedan demostrar que tienen un contrato basado en una estipulación de compensación mútua válida y suficiente, para apoyar su pretensión de que la exención y rebaja de contribuciones que reclaman, sea aplicable á su hacienda de caña denominada "Blandito".

En cuanto á esta pretensión del Abogado de los contribuyentes, citaremos un caso que comprende circunstancias análogas. Dicho caso fué resuelto por el Tribunal Supremo de los Estados Unidos, y se originó en Pensylvania.

Una Ley de la Legislatura establecida en 1883, había eximido la propiedad de un hospital del pago de contribuciones por un período indefinido, y diez y ocho años después, esa ley fué derogada. Aunque se pretendió que dicha ley constituía un contrato, el Tribunal Supremo dijo:

"Los demandantes pretenden que la exención concedida por la ley de 1883, es perpétua, y que la ley misma es en efecto un contrato. Esta concesión de la Legislatura fué expontánea, y nò se impuso á la Corporación ningún servicio ó deber, ú otra condición remunerativa. Dicha concesión pertenece á la clase de leyes denominada "privilegia favorabilia." · Ella comprendía solamente á la propiedad inmueble que pertenecía á la Corporación, y mientras seguía siendo la propiedad de la misma; pero no hay que deducir necesariamente de estos hechos, el que la concesión sea perpétua ó que haya sido hecha para continuar envigor mientras dure la existencia de la Corporación."

"No se debe apoyar semejante interpretación, puesto que el poder de imponer contribuciones es necesario para la existencia del Estado, y debe ser ejercido con arreglo á las varias condiciones de la República. La Ley de 1833 pertenece á una clase de Estatutos que deben entenderse en el sentido más extricto que permita llevar á efecto justamente la intención de la Legislatura. Todas las leyes, todas las instituciones políticas, son disposiciones para el porvenir, y su manifiesto objeto es el de dar á los intereses de la sociedad una permanente y firme seguridad. Bentham dice "Que puede decirse de todas las leyes, que han sido ideadas con la intención de que habían de ser perpétuas; pero "perpétuo no es sinónimo de irrevocable"; y el principo sobre el cual todas las leyes debieran estar establecidas, y sobre el cual la mayor parte de las mismas están establecidas, es el de revocable perpetuidad—perpetuidad revocable con motivo de un cambio de las circunstancias y razones en que está basada la ley."

"Está en la naturaleza de tal privilegio como lo es el conferido por la ley de 1833, el cual existe *bene placitum* y puede ser revocado á voluntad del soberano."

Rector &c., of the Christ Church, v. Philo County 65 U. S. (24 Howard) 302-303.

El Tribunal Supremo de los Estados Unidos, en una causa porterior, acentúa nuevamente esta doctrina en las claras y concisas palabras siguientes:

"Se ha declarado muchas veces por este Tribunal, que un Estado puede hacer un contrato válido al efecto de que una Corporación ó la propiedad de la misma, dentro de su territorio, estará exenta del pago de contribuciones ó que estará sujeta á la imposición de una contribución limitada y especificada." (Haciendo referencia á muchos casos.)

"El Tribunal ha declarado, sin embargo, en los términos más enfáticos, en cada ocasión, que las palabras con que el Estado renuncia á su derecho de imponer contribuciones, deben ser claras é inequívocas. El contrato ó la disposición legislativa debe expresar claramente que no habrá otra ó ulterior obligación en cuanto al pago de contribuciones. Un Estado no puede despojarse á sí mismo de este esencialísimo poder por efecto de palbras dudosas. No puede ser privadó de este más alto atributo de soberanía por efecto de palabras ambiguas. . Este principo ha sido establecido claramente en cada uno de los casos citados. Nunca ha sido abandonado."

Erie Railway Co., vs. Pensylvania 88 U. S. 498 & 499.

El mismo abogado de los contribuyentes también cita
y confía en el caso de Darmouth College, que fué resuelto
en 1819 y cuya relación se encuentra en 17th U. S. (4th.
Wheaton) 628.   Según nuestra opinión, dicho caso no tie-
ne aplicación al de que se trata, excepto en cuanto de-
muestra la fuerza de la disposición constitucional ante-
riormente citada.   La cuestión principal en aquella céle-
bre causa era si una carta constitucional que había sido
concedida á un colegio situado en New Hampshire, por el
Gobierno de la Gran Bretaña, cincuenta años antes, debía
ó no ser respetada por el Gobierno del Estado que más
tarde se había constituído entre las Colonias; y se decidió
que tal carta constitucional equivalía á un contrato y me-
recía la protección de la citada disposición constitucional,
y que por lo tanto, ningún Estado podía establecer una
ley, cambiando tal carta constitucional en su carácter
esencial sin que dicho cambio resultase en menoscabo de
la fuerza obligatoria del contrato celebrado entre el Go-
bierno anterior y el Colegio muchos años antes, lo que es-
taba prohibido por la Constitución Federal.

Tal vez no es necesario discutir la larga serie de deci-
siones que han seguido la doctrina sentada en la causa de
Darmouth College (Colegio de Darmouth), ni el efecto
que esas causas hayan tenido sobre la legislación y juris-
prudencia en los Estados Unidos.   Los famosos dictáme-
nes del Gran Juez Presidente y de sus hábiles asociados
Washington y Story, probablemente eran más trascen-
dentales de lo que él y sus asociados que estaban de acuer-
do con él en la decisión, preveían en esa época.   Pero pién-
sese lo que se quiera de esta notable decisión, á la luz de la
historia posterior, ella es la ley que rige en el país, y como
tal debe ser respetada.   Sigamos la corriente de las auto-
ridades conforme se ocupan en esta cuestión de tiempo en
tiempo.   Otra causa decidida por el Tribunal Supremo de

los Estados Unidos en 1830, en que el Juez Presidente Marshall también redactó el dictámen del Tribunal, es la de Providence Bank vs. Billings, 29, U. S. (Pet.) 558. De ese dictámen citaremos el siguiente párrafo:

"La reclamación del Banco de Providence es ciertamente nueva en absoluto. La facultad de imponer contribuciones á Corporaciones financieras, ha sido ejercida frecuentemente, y que sepamos, nunca ha encontrado oposición. Sin embargo, la novedad de esta oposición no constituye un argumento concluyente en contra de la misma. Que la facultad de imponer contribuciones es de una importancia vital; que dicha facultad es esencial para la existencia del Gobierno, son verdades cuya rearfirmación no es necesaria. Esas verdades son reconocidas y afirmadas por todos. Parece natural que no se presuma nunca que tal facultad sea renunciada. No diremos que un Estado no pueda nunca renunciar á dicha facultad; que no pueda existir una compensación suficientemente valiosa para inducirle á una renuncia parcial de la misma; pero como la comunidad entera tiene interés en conservar plenamente dicha facultad, esa comunidad tiene el derecho de insistir en que no se presuma que esa facultad ha sido abandonada en un caso en que no aparezca el deliberado propósito del Estado de abandonarla."

Providence Bank v. Billings 29 U. S. (4 Pet.) 558-560.

Á esta causa siguió en 1853 una decisión del mismo alto Tribunal, en que el Juez Presidente Tayne leyó el dictámen de la Corte. La relación de dicho dictámen se halla *en 57 U. S. (16 How.) y citaremos un párrafo de la pági-*na 428, que dice lo siguiente:

"Todo el mundo admitirá que á excepción de los poderes renunciados con arreglo á la Constitución de los Estados Unidos, los pueblos de los varios Estados son absoluta é incondicionalmente soberanos dentro de sus respectivos territorios. De aquí que puedan imponer las contribuciones que tengan por conveniente, sobre personas ó cosas dentro de su dominio, y que puedan repartirlas á su discreción y juicio. Ellos podrán, si lo juzgaren conveniente, eximir á ciertas clases de bienes del pago de contribuciones, y repartir en otra forma la carga de sostener al Gobierno. Y ellos podrán hacer esto mediante las formas ordinarias de la Legislación, ó mediante con-

trato, según le parezca más conveniente al pueblo del Estado. No hay nada en la Constitución de los Estados Unidos que lo prohiba, ni se ha conferido á este Tribunal facultad alguna para poner en duda el derecho de un Estado de asumir obligaciones mediante tales contratos, siempre y cuando tenga por conveniente celebrarlos.''

Ohio Life Ins. & Trust Co. vs. Debolt. 57 U. S. (16 How.) 428.

Pero, luego el mismo ilustre jurista, en la misma causa, en la página 434 del mismo Tomo, se expresa en los siguientes términos:

''La regla de interpretación en casos de esta índole, ha sido bien establecida por este Tribunal. Las concesiones de privilegios y exenciones hechas á una Corporación, son interpretadas extrictamente en contra de la Corporación y á favor del público. Nada se reconoce excepto aquello que haya sido concedido en términos claros y explícitos. Y ni el derecho de imponer contribuciones, ni ningún otro poder de soberanía en cuya íntegra conservación la comunidad tenga interés, serán declarados por el Tribunal como renunciados, á menos que se haya manifestado la intención de tal renuncia en palabras demasiado claras para que se pueda equivocar su sentido. Esta es la regla sentada en la causa de Billings v. The Providence Bank, y que ha sido nuevamente confirmada en el caso de The Charles River Bridge Company.''

Ohio Life Ins. & Trust Company, v. Debolt 57 U. S. (16 How.) 434.

El Juez Presidente, continuando en el mismo dictámen, en la página siguiente, dice:

''Y si varias personas se resuelven por aceptar una carta constitucional, en la cual las palabras empleadas son susceptibles de diferentes sentidos—ó que puedan ser consideradas por los representantes del Estado como palabras legislativas solamente, y como sujetas á futura revisión y derogación, y no como palabras de un contrato—las partes que la aceptan no tienen extricto derecho para pedir á este Tribunal que ejerza su alto poder sobre un Estado con motivo de palabras dudosas ó ambiguas, ni con motivo de ninguna interpretación que se suponga equitativa, ó de inferencias que se hagan de otras disposiciones contenidas en el acta de incorporación. Si hay consideraciones equitativas á su favor, deben dirigir su solicitud al Estado, y no á este Tribunal. Si es que se han presentado para

reclamar cualquiera exención de la parte que por igual les correspon-
de de las cargas públicas, ó cualquiera exención ó privilegio peculiar,
estos deben constar por palabras claras é inequívocas.''

Ohio Life Ins. & Trust Company, v. Debolt 57 U. S. (16 How.) 435.

Algunos años más tarde, ó sea en 1862, surgió una cau-
sa en el Estado de Wisconsin, que envolvió la facultad de
un Estado para imponer contribuciones sobre cierta pro-
piedad dentro de sus límites; y el Tribunal Supremo de
los Estados Unidos, hablando por conducto del Juez
Swayne, al pronunciar su fallo, enunció las siguientes
proposiciones:

"La Ley de 1854 autorizó hacer empréstitos de dinero, la emisión
de cédulas y la imposición de una contribución sobre todas las pro-
piedades en la Ciudad, para los fines especificados. La imposición,
modificación y abolición de contribuciones y la exención de propie-
dades de tales cargas, es un ejercicio ordinario del poder de sobera-
nía del Estado. No hay compromiso expreso ni tácito de
que esa facultad no había de ejercerse posteriormente. Admitiendo
que el Estado pudo celebrar tal contrato, no hay pruebas de que
lo hiciera. Este hecho no debe nunca presumirse, á no ser que el
texto sea demasiado claro para permitir una duda. Si el convenio
existía, entonces el demandante no está en el caso de suscitar la cues-
tión. No se ha alegado que la contribución impuesta sea insufi-
ciente. No conocemos ninguna queja de los tenedores de las cédulas.
Ellos no han comparecido ante nosotros. No corresponde al deman-
dante hacer cumplir el contrato de ellos ni proteger sus derechos por
delegación de los mismos.''

·Gilman v. City of Sheboygan, 67 U. S. (2 Belk) 513.

En 1871, se presentó al Tribunal Supremo de los Esta-
dos Unidos una causa procedente de la Corte Suprema de
Michigan, cuya causa comprendía cuestiones muy pareci-
das á las de que se trata en el presente caso. El Estado
de Michigan, mediante una ley establecida en forma regu-
lar por la Legislatura, había ofrecido un premio de diez
centavos por cada bushel (fanega americana) de sal fa-
bricada durante determinado número de años. Se decla-

ró que esta ley no constituía un contrato en tal sentido de
que no pudiera ser derogada. El Tribunal Supremo, al
discutir este asunto, declaró que tal ley era solamente una
ley remuneratoria, y que tenía el mero fin de reglamentar
la economía interna del Estado, y que tal estímulo gene-
ral se ofrecía indistintamente á todas las personas, para
que se ocupasen en alguna manufactura ó industria espe-
cial. El dictámen del Tribunal Supremo, que fué leido
por el Juez Bradley, concluyó con las siguientes palabras:

"En resúmen, la ley, á nuestro juicio, no pertenece á esa clase de
leyes que pueden denominarse contratos, excepto en cuanto hayan sido
realmente ejecutadas y cumplidas. No hay estipulación expresa ó im-
plícita de que no ha de ser derogada. Estímulos generales ofre-
cidos á todas las personas indistintamente para que se dediquen á
alguna industria ó manufactura especial, ya consistan dichos estí-
mulos en premios ó rebajas, ó en otras ventajas, están siempre
bajo el dominio de la Legislatura, y pueden ser suspendidos en cual-
quiera época."
Salt Co. East Saginaw, 80 U. S. (13 Wall) 397.

Y en el año 1874, el Tribunal Supremo confirmó nueva-
mente esta doctrina en la causa de Tusker v. Ferguson, la
cual se halla relacionada en 89 U. S. (22 Wall) empezan-
do en la página 527. El Juez Swayne leyó un dictámen
muy extenso y bien razonado, del que citamos los siguien-
tes párrafos:

"La sociedad en cuanto concierne á la cuestión de derecho, era
igual á todos los demás enagenatarios de los Estados Unidos. No se
puede decir en sentido extricto, que la imposición de contribu-
ciones sea una disminución del valor de los terrenos. Si el Con-
greso lo hubiese pensado así, la habría prohibido. La sujección á la
imposición le contribuciones es un incidente de todos los bienes
raices. La exención es una excepción. Cuando se la reclama como
efectiva, debe ser demostrada claramente."

"La disposición del artículo 37 de la Ley de 1871, por la que
se eximen los terrenos especificados de la imposición de contribucio-

nes locales durante tres años, á contar desde el primero de Abril de 1871, cuyo período no ha transcurrido todavía, no era un contrato. No había estipulación de prestaciones mútuas. No se le exigió á la sociedad hacer nadá, y dicha sociedad no hizo nada en compensación. Entre individuos, esa estipulación pertenecería á la categoría de pactos nulos. Dicha estipulación no tiene un carácter más elevado porque una de las partes era un Estado y la otra una Corporación, ni porque se le dió la forma de una ley. Era la promesa de una gracia, cuya promesa se hizo expontáneamente, y la cual podía cumplirse, cambiarse ó revocarse á voluntad.''

"La facultad de imponer contribuciones es vital para las funciones de Gobierno. Contribuye á sostener el pacto social y á darle eficacia. Su objeto es fomentar el bienestar general. Alcanza á los intereses de cada miembro de la comunidad. Dicha facultad puede ser restringida por contratos en casos especiales para el bien público, cuando tales contratos no estén prohibidos. No debe haber presunciones á su favor. Toda duda razonable debe ser resuelta en su contra. En los casos en que tal contrato existe, debe escudriñársele rigurosamente, y no debe permitirse nunca que sea ampliado ya sea en su duración ó ya en su alcance, más allá de lo que claramente exijan los términos de la concesión. Tal contrato es derogatorio del derecho público, y limita un deber establecido para el bien de todos.''

Tucker v. Ferguson 89 U. S. (22 Wall) 573, 574, 575.

La doctrina enunciada y el fallo dictado en la causa de Tucker v. Ferguson (22 Wall 527), fueron confirmados en un caso subsiguiente, ocurrido en Wisconsin, en Octubre de 1876. Era la causa de West Wisconsin R. R. Co. v. Supervisors of Trempealeau County, 93 U. S. 597 *et seq.*

El Juez Swayne, que también era Ponente en dicha causa, refiriéndose á la anteriormente mencionada, y citando partes de la misma, dice:

"Declaramos en el presente caso, como hemos declarado en aquél, que las exenciones de que se trata, eran gracias ofrecidas por el Estado sin elemento alguno de contrato. No había ninguna promesa, ni insinuación de la intención de que dichas exenciones habían de ser irrevocables, ó que las leyes en cuestión no habían de es-

tar en todo tiempo sujetas á derogación ó modificación en la misma
forma que otras leyes. Si hubiere existido una intención distin-
ta, se la habría sin duda manifestado claramente mediante las palabras
empleadas. No se hubiera expuesto tal intención á tropezar con los
posibles resultados de una lucha y conflictos como los que han ocu-
rrido en este litigio.''

"El Estado eligió seguir dispensando la gracia por algún tiem-
po, y después la suprimió. La exención concedida por ambas leyes
fué derogada, un año antes de que se emitieran las cédulas de la
última serie y antes de que transcurriera el primer término ó de
que empezara el segundo. El Estado hizo aquello para lo cual te-
nía un derecho no restringido. En tales casos, una duda razo-
nable es fatal para la reclamación. Toda presunción es *prima facie*
en su contra. Solo cuando los términos de la concesión son de-
masiado explícitos para permitir buenamente alguna otra interpre-
tación, es que puede tener apoyo dicha proposición. Providence
Bank v. Billings, 4 Pet. 561; Christ Church v. Philadelphia, 24
How. 302; Gilman v. Sheboygan, 2 Black, 513; Herrick v. Randolph.
13 Vt. 531; Easton Bank v. Commonwealth, 10 Penn. St. 450;
People v. Roper, 35 N. Y. 629.''

"Declaramos que la conclusión que hemos enunciado, es la ley
que rige en el presente caso. No tenemos nada que ver con la ética
del mismo. Ese punto no se halla sometido á nuestra considera-
ción.''

Esto nos lleva en la corriente de autoridades al caso de
Welch v. Cook, 97 U. S. 541, que es el en que se apoya
principalmente el Fiscal, en su informe oral ante esta
Corte. En dicho caso aparece que el Distrito de Columbia
que en esa época tenía Asamblea Legislativa, estableció
una ley disponiendo que toda propiedad real y personal,
que en lo futuro fuera realmente utilizada para fines ma-
nufactureros, estaría exenta del pago de contribuciones,
durante un período de diez años. Más tarde la Asamblea
Legislativa del Distrito de Columbia fué abolida por el
Congreso de los Estados Unidos, y se estableció una ley
imponiendo ciertas contribuciones á todos los bienes raí-
ces en dicho Distrito, á excepción de los pertenecientes á

los Estados Unidos y al Distrito de Columbia y los utilizados para fines educativos y caritativos, derogando así la ley por la cual se exoneraba á los bienes raíces dedicados á fines manufactureros. Welch y otros, que habían invertido su dinero en empresas manufactureras dentro de dicho Distrito, entablaron demandas para impedir la recaudación de contribuciones, y reclamando la exención en virtud de la Ley de la Legislatura. La causa finalmente llegó al Tribunal Supremo de los Estados Unidos, y el Juez Hunt leyó el dictámen del Tribunal. Todo el dictámen es digno de una cuidadosa lectura y consideración; sin embargo, citaremos solamente dos párrafos:

"Bajo estas circunstancias, y puesto que la ley tenía un preámbulo en forma de una explicación de que se hacía esta recaudación de contribuciones para sostener al Gobierno y mantener su crédito, es evidente que la ley del Congreso tuvo por objeto crear un sistema por separado, y que fuera independiente de la acción de todos los Congresos anteriores. Otras distintas exenciones habían existido anteriormente; no se había adoptado ningún sistema fijo. La Ley de la Asamblea Legislativa de 1871, fijando las contribuciones para aquél año, consignaba más de cuarènta exenciones, cuya circunstanciada relación ocupaba una página entera en el libro de Estatutos, (pag. 26); la ley del mismo cuerpo legislativo en que se fijaron las contribuciones para el año 1872, eximió solamente las casas parroquiales, las iglesias, el terreno en que se hallaban fabricadas, y los Cementerios (pag. 109); en dicha ley se declara que se impondrán contríbubiones sobre todos los bienes raíces, á excepción de los expresamente exceptuados por la misma; nosotros creemos que el sistema de contribuciones, al comprender lo que debía pagar contribuciones, los tipos de las mismas y sus exenciones, tuvo por objeto establecer un sistema independiente, abolir imposiciones ó exenciones existentes, y formar un sistema completo por sí mismo."

"Tampoco podemos estimar que este proceder envuelva una deslealtad contra el dueño de la propiedad manufacturera. Admitiendo, como debe admitirlo y lo admite el demandante, que la exención de su propiedad era un acto de liberalidad de la Legislatura, sabía al aceptar dicha exención, que ella estaba sujeta á revocación en cualquiera época en que la Legislatura local ó el Con-

greso creyeron que el interés público así lo exigía. El no podía menos de comprender que la imposición de una contribución del tres por ciento sobre el valor de la propiedad en Washington, y del dos y medio por ciento sobre el de la propiedad en Georgetown, creaba un gravámen oneroso. Otros sufrían ese gravámen lo mismo que él, y es natural suponer que el Congreso consideraba como un deber, el aminorar la carga de la contribución hasta donde fuera justo, mediante el aumento de las cosas sujetas á dicha carga.''

Welch v. Cook. 97 U. S. 544, 545.

Aunque no es una práctica que debe seguirse en general, la de hacer largas citas de autores de texto en los dictámenes de los Tribunales de Apelación, sin embargo, como en el presente caso la discusión ha tomado grandes proporciones, y no parece haber entre los miembros del Colegio local de Abogados, gran familiaridad con los principios elementales que rigen en el presente caso, según éste se entiende en el Continente, una discusión tomada de un libro de texto que está universalmente reconocido como uno de los mejores de su clase, puede que no huelgue.

Aquél eminente jurista, Thomas M. Cooley, quien durante tantos años fué un adorno del Tribunal Supremo de Michigan, en su gran obra sobre contribuciones, que tantas veces ha sido citada por los Tribunales más altos del Continente americano, que le impartieron su conformidad, al resumir los dictámenes judiciales concordantes, conforme han sido emitidos por los Tribunales, y añadiendo y aportando á los mismos su propia sabiduría, dice:

''EL PODER DE IMPONER CONTRIBUCIONES ES UN INCIDENTE de la soberanía.—El poder de imponer contribuciones es un incidente de la soberanía, y lo posee el Gobierno sin que lo haya sido expresamente conferido por el Pueblo. Es un poder legislativo, y cuando el Pueblo, por su constitución, crea un Departamento al cual confiere el poder de hacer leyes, el de imponer contribuciones es conferido como parte del poder general. Aun tratándose de un gobierno ilegal, con tal que por el momento sea un gobier-

no de hecho, que sostenga su autoridad é imponga obediencia á sus leyes, puede ejercer el poder de imponer contribuciones, y tal poder, hasta donde haya sido puesto completamente en vigor, debe ser reconocido como legal. Pero la derribación del gobierno de hecho, derriba también el poder; y el gobierno legal no se prestará en adelante para hacer efectivas las contribuciones no recaudadas.

"Toda cosa á la cual se extiende el poder legislativo, puede ser sujeta á la imposición de contribuciones, ya sea una persona, ó propiedad, ó posesión, franquicia ó prilegio, ú ocupación ó derecho. Nada excepto una expresa limitación constitucional de la autoridad legislativa, puede excluir una cosa comprendida en dicha autoridad, del alcance del poder de imponer contribuciones, si la Legislatura, á su discresión, en cualquier tiempo designare dicha cosa para fines rentísticos. Y no solamente es el poder ilimitado en su alcance, en cuanto á las cosas sujetas á él, sino que por su propia naturaleza no reconoce límites y puede dársele la extensión que el gobierno considere oportuna. Por lo tanto puede ser ejercitado repetidas veces sobre las mismas cosas hasta el extremo de agotarlas y arruinarlas, y de esta manera puede llegar á ser un poder destructivo. Si el poder amenaza con el abuso, se debe buscar garantía en la responsabilidad de la legislatura que impone la contribución, para ante sus comitentes, quienes deben pagarla. La Judicatura no puede conceder ninguna reparación contra contribuciones opresivas, mientras la legislatura al imponerlas se mantenga dentro de los límites de su autoridad, y no infrinja ninguna disposición expresa de la Constitución. El determinar la necesidad de imponer tal contribución, corresponde á la discreción legislativa, y es ó puede ser una necesidad urgente que no admita el derecho de propiedad ú otros derechos del ciudadano, que se opongan á ella, mientras no esté satisfecha.

Cooley on Taxation, pp. 5 & 6.

"RESTRICCION Ó RENUNCIA DEL PODER POR CONTRATO.—En algunos casos se vé que la Legislatura del Estado ha dado en garantía al propio Estado de un modo definitivo y formal, al efecto de que, con respecto á determinadas cosas sujetas á contribución, se abstendría de imponerle ninguna clase de las mismas, ya perpétua, ya temporalmente, ó que las impondría solamente hasta cierto límite. Tales garantías son comunmente impolíticas é imprudentes, y siempre existe la probabilidad de que, si son sostenidas, puedan llegar al extremo de menguar el poder soberano del Estado

de ejercer sus funciones habituales. Por esta razón, ha habido siempre una fuerte protesta contra la doctrina de que constitucionalménte puedan darse tales garantías; insistiendo los que protestan en que ninguna legislatura tiene capacidad para limitar el poder de su sucesor, sino que debe trasmitir á los que vengan después, el pleno poder que recibió de su predecesor. Pero el Tribunal Supremo Federal, en una causa primitiva en que se trataba de un Estado que había cambiado terrenos con una tribu indígena, y estipulado por una ley que los terrenos traspasados á los indios no habían de ser en lo sucesivo objeto de ninguna contribución, decidió que tal estipulación era obligatoria para el Estado, como un contrato; que el Estado no podía imponer contribuciones en contravención á dicha estipulación, y que la exención era aprovechable en favor de aquellos que más tarde, con permiso legislativo, compraron los terrenos á dichos indios. El contrato deriva su carácter de inviolabilidad de la cláusula de la Constitución de los Estados Unidos, cohibiendo á los Estados la promulgación de ninguna ley que resulte en menoscabo de la fuerza obligatoria de los contratos; una cláusula que es aplicable á los contratos de Estados al igual que á los de individuos.

"La garantía, sin embargo, para constituir un contrato, debe tener sus elementos, y los elementos esenciales son consentimiento y prestación. El consentimiento á la exención por parte del Estado, nó es nunca suficiente de por sí; sino que el Estado debe recibir algo por la renuncia, ó la otra parte debe ceder alguna cosa que pueda considerarse como una compensación legal. En el primer caso á que se ha hecho referencia, la prestación era manifiesta, pues el Estado estaba enagenando sus terrenos, y ofrecía la exención de contribuciones como un estímulo para conseguir mejores proposiciones de la otra parte.

Así es que si la Legislatura, por medio de una ley y á fin de asegurar el establecimiento de una institución benéfica, concede una carta constitucional á una Corporación, declarando en dicha carta, que la propiedad de la misma estará exenta de contribución, y si unas personas, confiadas en ello, invierten sus recursos en realizar el objeto de la ley, de este modo se ha pactado una prestación correlativa á la promesa del Estado. El caso sería aún más claro si el Estado recibiera un bono por la concesión de una franquicia, estipulando en la concesión la exención del pago de contribuciones, ó si la concesión fuere hecha á una Corporación, la renuncia por ésta de algunos derechos valiosos.

El contrato de exención puede ser perpétuo ó limitado á un período determinado, y puede ser de las contribuciones en general, ó de una parte de las mismas, y también puede consistir en una limitación de la contribución dentro de cierto círculo. Los mismos principios son aplicables en cada caso. En los casos en que se especifica una suma, ó un tanto por ciento sobre la valoración ó sobre ingresos ó entradas, en cualquiera forma, esto tiene el carácter de una conmutación de contribuciones, aceptando el Estado que la suma designada es, bajo las circunstancias un verdadero equivalente de la suma á que ascenderían las contribuciones corrientes, ó á la exacta proporción que la persona con quien se hace la transacción, debiera pagar, y el poder de conmutar de este modo, aunque esté expuesto á abusos, está fuera de duda. Y esta regla es aplicable cuando se paga un bono por la completa futura exención, en la misma extensión y por las mismas razones, que cuando la conmutación se hace por un pago anual.

Está perfectamente sentado, sin embargo, que una excepción que se haya concedido meramente por motivos de política de Estado, y cuando el Estado y el ciudadano no se hallan sobre una base de transacción y prestación, debe considerarse solamente como la expresión de la voluntad actual del Estado con respecto al asunto; y la ley por la que se conceda dicha exención, está al igual de las leyes en general, sujeta á modificaciones ó derogación á discreción de la Legislatura, y no tiene importancia el que durante su vigencia alguna de las partes haya procedido confiando en ella. Asímismo está declarado que el contrato debe estar redactado claramente. Siendo el poder de imponer contribuciones esencial para la misma existencia del Estado, no puede haber presunción de que haya sido abandonado ó restringido, y quienquiera que pretenda que lo ha sido, debe estar en condiciones de probar en términos claros que consta la intención de hacerlo, y que existió prestación para ello. Y cuando se ha hecho el contrato de este modo, no puede ser ampliado por deducción más allá del exacto sentido de sus términos. Como se ha dicho por el Tribunal Supremo Federal, ''si al hacer una lógica interpretación de la ley, existe una duda razonable acerca de la existencia del contrato, esta duda debe resolverse á favor del Estado. En otras palabras, el texto usado debe ser tal que interpretado lógicamente, no deje lugar á controversias.''

''Por repetidas decisiones del Tribunal Supremo Federal, se ha determinado autoritativa y concluyentemente que la carta constitucional de una Corporación Privada debe considerarse como un contra-

to entre los individuos de la Corporación de una parte y el Estado
de la otra; y cualesquiera que sean las estipulaciones. contenidas
en la misma con el objeto de beneficiar á los miembros de la Corpo-
ración, y producir el efecto de un estímulo sobre ellos para aceptar
la carta constitucional, son promesas hechas por parte del Estado,
basadas en una estipulación de compensación mútua válida y sufi-
ciente, y no están sujetas á revocación, excepto con el consentimiento
de la Corporación misma. Las estipulaciones respecto á la imposición
de contribuciones, se hallan comprendidas en este principio y son
por lo tanto irrevocables, y no están sujetas á cambios por la sola
voluntad del Estado, en perjuicio de las personas á cuyo favor se
han hecho. Pero el derecho de enmendar ó revocar puede reser-
varse en la carta constitucional, y cuando se ha hecho esa reserva,
forma parte del contrato y puede ejercitarse por el Estado á volun-
tad, á menos que se hayan impuesto condiciones con respecto á su
ejercicio, en cuyo caso deben observarse dicha condiciones. Para
evitar la fuerza del principio de que la carta constitucional de una
Corporación es un contrato, cuyo principio muchas veces produce
efectos inesperados y tal vez injustos para el público en general,
los pueblos de algunos de los Estados han dispuesto expresamente
en sus constituciones, que todas las cartas constitucionales de in-
corporación particular, concedidas por la Legislatura, estarán sujetas
á enmendatura ó revocación, á voluntad de aquella. Una disposición
de esta naturaleza es una limitación del poder de la legislatura para
conceder cartas constitucionales, y aunque no podrá afectar á nin-
guna de las que existen cuando empieza á regir, dá la calidad de
modificable y revocable á cualesquiera cartas constitucionales que
se concedan después; y todas las personas que las acepten, lo hacen
con pleno conocimiento de tal circunstancia. Las cartas constitucio-
nales aún así son contratos, pero contratos con el derecho reservado
por parte del Estado, de enmendarlos ó restringirlos. La regla
sería la misma si la carta constitucional fuera concedida, estando
vigente una ley general del Estado, que declarase que todas las
concesiones de esa clase habían de estar sujetas al poder legislativo
de alteración ó revocación.; pues los concesionarios aceptarían sus
franquicias con conocimiento de tal declaración, quedando dichas
franquicias limitadas por la misma.

''Los contratos de un Estado, al igual de los de individuos par-
ticulares, pueden ser modificados indefinidamente con sujeción á
las disposiciones constitucionales si es que las hay—que tenga refe-
rencia á dicho derecho, mediante el consentimiento mutuo de las

partes de dichos contratos, que en el caso de una carta constitucional de una Corporación particular, serían el Estado de una parte, y los individuos de la Corporación de la otra. El Estado consiente en la modificación si establece leyes que tengan tal efecto, y la Corporación, si acepta tales leyes.

Una regla distinta prevalece en el caso de las cartas de incorporación municipal. Estas no son contratos, sino reglamentos de gobierno; y si contienen disposiciones con respecto á la imposición de contribuciones, tales disposiciones, lo mismo que todo lo demás en la carta constitucional están sujetas á cambios, á medida que cambie la opinión de la Legislatura respecto á cuestiones de política y conveniencia, ó que el cambio de las circunstancias lo exija.''

Cooley on Taxation pp. 66, 67, 68, 69, 70, 71, 72 y 73.

Por un cuidadoso exámen de estos extractos, de los dictámenes del Tribunal Supremo de los Estados Unidos y del sumario contenido en el citado libro de texto, se verá que la minuciosa prueba practicada en todas esta serie de decisiones, y la cual es aplicable al caso pendiente ante este Tribunal, tiende á aclarar si existe ó no un contrato entre el Gobierno y el contribuyente. Si existe un contrato, entonces, en virtud de la cláusula citada del inciso 10 del artículo 1 de la Constitución de los Estados Unidos, la imposición de contribuciones es ilegal y debe suprimirse. Si no hay contrato, entonces la Ley de Rentas está en pleno vigor, y las contribuciones deben imponerse y recaudarse. Nosotros somos del parecer de que, para que exista un contrato entre el Estado y uno de sus ciudadanos, ya sea una persona particular, ó ya una Corporación, lo mismo que entre dos individuos, se necesita una estipulación de compensación mútua que constituya el móvil de las dos partes; de lo contrario sólo existe lo que en uno de los dictámenes citados, se denomina *un pacto nulo*. En otras palabras, á menos que se le exija al contribuyente que haga algo y que haya hecho algo en beneficio del Estado, no podrá pretender que la exención ó reducción que se le haya concedido en sus contribuciones constituya un contrato y que por esa razón sea irrevocable.

Una compensación mútua puede definirse como "algún beneficio que una de las partes contratantes deriva de la otra ó que una de dichas partes consiente en conferir á la otra, y á cuyo beneficio el beneficiado no tenía derecho anteriormente; y por otra parte, algún perjuicio que una de las partes contratantes sufra ó acepte, y que no sea el que anteriormente estaba obligado á sufrir; siendo ese beneficio y ese perjuicio en un lado ó en el otro, el aliciente para la celebración del contrato.

¿Ha recibido la Isla algún beneficio, ó han sufrido los contribuyentes algún perjuicio con motivo de la concesión reclamada en virtud de la Ley española? ¿No han sido todos los beneficios á favor de los que aceptaron la concesión? No han sido compensados con gran exceso de todas las sumas de dinero que han gastado? Hasta la mayor salubridad de la comarca, la gozan exclusivamente ellos y sus inquilinos. ¿Por qué había de exigirse á sus convecinos, contribuir con una suma mayor para el sostenimiento del Gobierno, para disminuir así la carga de estos hacendados de caña? Lo han hecho durante varios años, pero ¿no ha llegado ya el momento de que tales desigualdades en las cargas de gobierno deban cesar?

En el caso de que se trata ante este Tribunal, no hay nada absolutamente que indique, ni nada consta en los autos que demuestre que los Señores Guerra hayan hecho algo ó que hayan sufrido alguna pérdida ó inconveniencia en virtud de la cual pudieran pedir al Gobierno que se redujeran sus contribuciones ó que se les eximiera del pago de las mismas. Es cosa fuera de duda que el Gobierno no derivó beneficio alguno de ninguno de esos actos. Todo el beneficio derivado de sus actos respecto á la finca conocida por "Blandito" para la cual se reclama la exención, fué aplicado á su misma propiedad. Es cierto que la finca pudo ser lograda mediante el saneamiento y desecación de ciénegas; puede ser que terrenos baldíos hayan sido puestos en cultivo, y pueden haberse hecho otras inversio-

nes y mejoras; pero en recompensa de eso, los autos demuestran la probabilidad de que la salud de sus familias y de sus inquilinos y empleados haya sido afianzada, y que han tenido anualmente grandes cosechas de caña de azúcar; y que el Gobierno Insular no participó en un solo centavo de esos beneficios y ganancias.

El hecho ulterior de que ese privilegio, que los referidos señores obtuvieron del Gobierno español en 1896, no fué perturbado por el Gobierno americano, ni revocado hasta la promulgación de la ley de Rentas por el Gobierno Insular, en 31 de Enero de 1901, no apoya la pretensión que se trata de sostener.

Aunque el Gobierno dominante en la Isla, tenía el derecho proceder con respecto á este asunto en cualquiera época, no estaba obligado á proceder sino hasta que pareciera oportuno hacerlo, según la opinión de sus autoridades legislativas. La demora en la derogación resultaba en beneficio de los apelados, y ellos no pueden quejarse de la misma, ni reclamar nada por ella, excepto los beneficios incidentales que naturalmente nacen de las reducciones y exenciones temporales. No hay nada absolutamente en el presente caso que sea análogo á un "estoppel" ó sea un acto ó manifestación por parte del Gobierno que obligue á éste ó á sus funcionarios, á respetar ó perpetuar el privilegio temporal gozado por los apelados.

Es inútil prolongar esta discusión que ya excede los límites ordinariamente concedidos á las causas de esta índole é importancia. Faltando en la transacción entre el Gobierno y los contribuyentes una estipulación de compensación mútua, no pudo haber un contrato válido, y, por lo tanto, la ley de exención establecida por la Reina de España en 1869, debe considerarse derogada por la Ley de Rentas de la Asamblea Legislativa de Puerto Rico, el 31 de Enero de 1901. Por esta y las demás razones consignadas en la presente, debe revocarse el fallo del Tribunal de Distrito, y dictarse sentencia á favor del Gobierno

Insular, permitiendo al Tesorero recaudar las contribuciones impuestas, y denegando el auxilio solicitado por los apelados é imponiéndoles todas las costas del procedimiento, tanto en este Tribunal como en el inferior.

*Revocada.*

Jueces concurrentes: Sres. Presidente Quiñones y Asociados Hernández y Figueras.

El Juez Asociado Sr. Wolf no formó Tribunal en la vista de este caso.